**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| NORTH PORT FIREFIGHTERS'<br>PENSION-LOCAL OPTION PLAN,<br>Individually and on Behalf of All<br>Others Similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 3:11-cv-00595<br>JUDGE HAYNES |
| LAKELAND EMPLOYEES<br>PENSION PLAN,<br>Individually and on Behalf of All Others<br>Similarly Situated, | ) ) ) ) ) | |
| Lead Plaintiff,<br>vs. | ) ) ) | |
| FUSHI COPPERWELD, INC., et al. | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

# TABLE OF CONTENTS

A. ANALYSIS OF THE AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   1. THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   2. FUSHI'S FINANCIAL REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      a. Fushi's SWAP Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      b. Fushi's Acquisition Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      c. The Restatements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      d. Fushi's Internal Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      e. Sarbanes-Oxley Certifications . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      f. Misstatements and Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   3. INDIVIDUAL DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      a. Defendant Fu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      b. Other Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   4. Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

   5. Fraud on the Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B. CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

   1. PLSRA STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

   2. PLAINTIFFS' SECTION 10B-5 CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      a. Defendants' Misrepresentation and Omissions . . . . . . . . . . . . . . . . 53

      b. Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

      c. Plaintiffs' Scienter Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      d. Dura's Injury Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

3. Plaintiffs' Section 20(a) Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

C. RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Plaintiffs, North Port Firefighters' Pension-Local Option Plan ("North Port") and City of Lakeland Employees Pension Plan, filed this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78 et seq. (2010), and Rule 10(b) promulgated thereunder, 17 C.F.R. § 240.10b-5 (2010), on behalf of themselves and a class of shareholders against the Defendants, Fushi Copperweld, Inc. ("Fushi") and the following Fushi corporate officers: Li Fu, Joseph J. Longever, Craig H. Studwell, and Wenbing Christopher Wang. In earlier proceedings, the Court appointed City of Lakeland Employees Pension Plan ("Lakeland Employees") as the Lead Plaintiff. Lakeland Employees then filed an amended complaint. (Docket Entry No. 57, Amended Complaint). Plaintiffs assert jurisdiction under 15 U.S.C. § 78aa of the 1934 Act.

In sum, Plaintiffs allege that from August 14, 2007 to May 4, 2011, when Plaintiffs purchased or held Fushi stock, the Defendants engaged in a scheme to portray Fushi as more financially successful than its actual financial condition. Defendants allegedly disseminated or approved false statements about Fushi's financial condition and acquisitions. Plaintiffs alternately allege that the Defendants deliberately disregarded false statements about Fushi to investors. Plaintiffs also allege that the Defendants' alleged misrepresentations and failures to disclose material facts rendered the Defendants' earlier statements about Fushi's finances false. Plaintiffs' specific assertions are that the Defendants' fraudulent scheme and course of business included the improper use of derivatives to inflate artificially Fushi's net income. In addition, Plaintiffs allege that the Defendants improperly treated unqualified acquisitions as "bargain purchases" and such improper accounting treatment deceived the investing public about Fushi's business by artificially inflating the price of Fushi's stock. Plaintiffs allege these improper practices violated Generally Accepted

1

Accounting Principles ("GAAP"). Defendants also allegedly failed to disclose that the Defendant Fu had ownership interests in these acquisitions. These statements and omissions caused Plaintiffs to purchase Fushi's securities at inflated prices. Plaintiffs assert that subsequent disclosures about the accounting violations involving Fushi's derivatives and acquisitions led to the collapse of Fushi's stock price, damaging the Plaintiffs. Plaintiffs seek a declaration of this action as a proper class action pursuant to Fed. R. Civ. P. 23, class damages, reasonable costs and attorney's fees, and injunctive or other equitable relief.

Before the Court is the Defendants' motion to dismiss (Docket Entry No. 65), contending, in essence, that Plaintiffs fail to state a claim under Sections 10(b) or 20(a) of the 1934 Act or Rule 10b-5 thereunder. In sum, Defendants' specific contentions are that:

(1) Plaintiffs' 10(b) claims against Defendants do not satisfy the pleading requirements of Fed. R. Civ. P. 8(a)(2) and 9(b) or the Private Securities Litigation Reform Act ("PSLRA") for failure to allege any material misstatement of fact;

(2) Plaintiffs' factual allegations do not support a strong inference of scienter in Fushi's accounting errors;

(3) Plaintiffs' allegations of reckless disregard are not entitled to a presumption of truth for scienter purposes;

(4) Plaintiffs' allegations of confidential witnesses and insider trading do not support a strong inference of scienter;

(5) Plaintiffs' allegations of motive and opportunity fail to meet the PLSRA's pleading requirements;

(6) Plaintiffs fail to plead facts of loss causation;

(7) Plaintiffs' failure to plead viable Section 10(b) claims requires a dismissal of Plaintiffs' Section 20(a) claims; and

(8) Plaintiffs fail to plead control person liability under Section 20(a) as to any of the individual defendants.

(Docket Entry No. 69, Defendants Memorandum in Support of Motion to Dismiss).

In their response, Plaintiffs assert, in sum: (1) that their complaint adequately pleads that Defendants made false, misleading, and material misstatements and omissions about Fushi's financial condition; (2) that under the applicable law, the totality of circumstances gives rise to a strong inference of scienter; and (3) that Plaintiffs' sufficiently plead loss causation. (Docket Entry No. 76, Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss). The Court set oral argument that was reset upon the parties' request.

Based upon the amended complaint and the parties' submissions and applying the holistic approach, the Court concludes, in sum, that Plaintiffs' amended complaint states plausible securities claims given Plaintiffs' factual allegations of the Defendants' admitted improper use of a SWAP to inflate the value of Fushi stock, the Defendants' admitted improper accounting treatment of bargain acquisitions, the Defendants' failure to disclose the Defendant Fushi's ownership interests in those acquisitions and insiders' false statements about the Defendants' financial practices.

## A. ANALYSIS OF THE AMENDED COMPLAINT

### 1. THE PARTIES

According to Plaintiffs' amended complaint,[1] Plaintiffs purchased Fushi shares during the

---

[1] Plaintiffs' amended complaint, (Docket Entry No. 57), supersedes the original complaint, (Docket Entry No. 1). Clark v. Tarrant Cnty., 798 F.2d 736, 740-41 (5th Cir. 1986). Plaintiffs' amended complaint exceeds sixty five pages. In addition, the parties submitted extensive memoranda. As discussed infra, documents attached to or referred to in a complaint are to be considered on a motion to dismiss. For these claims, judicial analysis now is a "holistic approach." Frank v. Dana Corp., 646 F.3d 954, 961 (6th Cir. 2011) ("Dana II") (citing Matrixx Initiatives, Inc. v. Sarocusano, __ U.S. __, 131 S. Ct. 1309, 1323-25 (2011)). Yet, the Court must take a "collective view of the facts, not the facts individually." Dana II, 646 F.3d at 961.

Class Period from August 14, 2007 through May 4, 2011.[2] (Docket Entry No. 57, Amended Complaint at ¶ 16). Plaintiffs allege that all persons who purchased or otherwise acquired Fushi securities during the Class Period were injured by the Defendants' false statements about Fushi's financial condition. This purported class excludes Defendants, Fushi's officers and directors, members of the individual Defendants' immediate families and any entity in which the Defendants have or had a controlling interest. Id. at ¶ 164.

Fushi is based in Dalian, China and produces bimetallic wire products that are sold primarily to customers in the telecommunications, electrical utility, and transportation industries throughout the world. Id. at ¶ 2. Fushi's common stock was listed and traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the symbol FSIN during the Class Period. Id. at ¶ 1. Fushi's business is conducted principally through wholly owned subsidiaries: Fushi International ("Dalian"), Bimetallic Cable Co. Ltd. and Copperweld Bimetallics, LLC ("Copperweld"). Id. at ¶ 25. Fushi acquired 100% of Copperweld in 2007. Id. During the Class Period, Fushi had approximately 600 employees, of whom 54% were in manufacturing. Id. The remaining employees were engineers or salespersons. Id.

Defendant, Li Fu ("Fu"), served as Fushi's chief executive officer from December 2005 through November 2009 and thereafter as Fushi's co-chief executive officer. Id. at ¶ 18. Since December 2005, Fu also served as Chairman of the Fushi's Board. Id. During the Class Period, Fu prepared and signed Fushi's 10-K Forms, filed with the Securities and Exchange Commission ("SEC"). Fu attested his review of the filings' contents for any untrue statements of a material fact

---

[2]The Class Period spans from August 14, 2007 through May 4, 2011. (Docket Entry No. 57, Amended Complaint at ¶ 1).

or omissions that would render the statements misleading. Id. Plaintiffs allege that Fu also issued press releases and participated in Fushi's conference calls (through an interpreter) with investors and was the primary person with knowledge about the Fushi's business, financial reports, and business practices. Id.

Since November 2009, Defendant Joseph J. Longever ("Longever") served as Fushi's co-chief executive officer and as a Fushi director since June 2010. Id. at ¶ 19. Longever, a Franklin, Tennessee resident, served as Fushi's chief commercial officer from July 2009 to November 2009. Id. Longever prepared and signed Fushi's 10-K Forms during the Class Period and attested to their accuracy. Id. Longever also issued press releases and participated in conference calls with investors as a person with knowledge about Fushi's business, financial reports, and business practices. Id.

Defendant Wenbing Christopher Wang ("Wang") served as Fushi's president and director since January 2008. Id. at ¶ 20. Wang was also Fushi's chief financial officer from December 2005 to August 2009 and was interim chief financial officer from February to October 2010. Id. Defendant Wang also prepared and signed the Fushi's SEC 10-K Forms during the Class Period and reviewed and attested to their accuracy. Id. Wang also issued press releases and participated in conference calls with investors representing himself as a primary person with knowledge about the Company's business, financial reports, and business practices. Id.

As to the other individual defendants, beginning in October 2010. Defendant Craig H. Studwell ("Studwell") served as Fushi's chief financial officer and executive vice president. Id. at ¶ 21. Defendant Beihong Linda Zhang ("Zhang") was Fushi's executive vice president and chief financial officer from September 2009 until her resignation in March 2010. Id. at ¶ 22.

## 2. Fushi's Financial Reports

According to Plaintiffs' amended complaint, beginning on August 14, 2007, Fushi issued a press release of its 2007 second quarter financial results. Id. at ¶ 67. In sum, Defendants reported Fushi's $26 million in revenue and $7 million with $0.28 diluted earnings per share ("EPS") for that quarter. Id. Fushi issued press releases at the end of each quarter and year with this same financial information on November, 14, 2007, March 12, May 14, August 12, and November 13, 2008, March 12, May 11, August 5, and November 6, 2009, March 10, May 4, August 4, and November 2, 2010. Id. at ¶¶ 70, 72, 76, 79, 82, 85, 89, 92, 95, 101, 105, 109, 112. Collectively, these press releases also contain the cited figures of revenue and earnings.

| | Revenue | Net Income | Diluted EPS |
|---|---|---|---|
| 3d 2007 | $32 million | $8.2 million | $0.33 |
| 4th 2007 | $26.5 million | $6.4 million | $0.23 |
| Full Year 2007 | $112 million | $48.5 million | $1.06 |
| 1st 2008 | $54 million | $7.6 million | $0.26 |
| 2d 2008 | $62.5 million | $7.3 million | $0.25 |
| 3d 2008 | $63.8 million | $9 million | $0.31 |
| 4th 2008 | $41 million | $4.6 million | $0.15 |
| Full Year 2008 | $221 million | $28.5 million | $1.00 |
| 1st 2009 | $35.3 million | $3.1 million | $0.11 |
| 2d 2009 | $48.3 million | $1.6 million | $0.06 |
| 3d 2009 | $47.7 million | $9.2 million | $0.31 |
| 4th 2009 | $51.7 million | $10 million | $0.34 |
| Full Year 2009 | $183 million | $24 million | $0.84 |
| 1st 2010 | $59.5 million | $7.4 million | $0.21 |
| 2d 2010 | $69 million | $13.4 million | $0.35 |
| 3d 2010 | $66.5 million | $13 million | $0.34 |

Id. at ¶¶ 70, 72, 76, 79, 82, 85, 89, 92, 95, 101, 105, 109, 112.

With the exception of the November 14, 2007 press release, the Defendants also hosted conference calls with investors after the press releases for these time periods. Id. at ¶¶ 73, 77, 80, 83, 86, 90, 93, 96, 102, 106, 110, 113. In each call, Defendants commented on Fushi's financial standing at that time and gave reasons for any changes in Fushi's value over the period. Id. Plaintiffs allege

that Defendant Wang spoke during the November 13, 2008, March 12, 2009, and March 10, May 4, August 4, and November 2, 2010 conference calls; that Defendant Zhang spoke during the November 6, 2009 call; and Defendant Longever spoke during the March 10, 2010 call. Id. at ¶¶ 83, 86, 96, 102, 104, 106, 108, 110, 113.

### a. Fushi's SWAP Transaction

On April 10, 2007 and in its August 14, 2007 SEC 10-Q Form, (effective January 24, 2007), Fushi disclosed its "Derivative Financial Instrument," that is a cross currency interest swap ("SWAP"), a derivative transaction. Fushi described this SWAP as "a cross currency hedge" and a "cash flow hedge" that was "to hedge the risk of rising interest rates on their variable interest rate debt." Id. at ¶ 34; 69. The SWAP's stated purpose was to address Fushi's interest rate risk on Fushi's variable rate interest payments in U.S. dollars on its $40 million high yield debt. Id. at ¶ 34. Under the SWAP, Merrill Lynch Capital Services, Inc. ("Merrill Lynch") agreed to pay Fushi the variable rate interest in U.S. dollars. Id. Fushi would use that rate to pay its debt holders of Fushi's $40 million high yield notes. In exchange, Fushi agreed to pay Merrill Lynch a fixed rate of interest in Renminbi ("RMB"), the official currency of China. Id. Plaintiffs allege that Fushi reference to the SWAP as a "cash flow hedge" enabled Defendants to inflate Fushi's net income by $5.6 million or 24% in 2007. Id. at ¶ 39.

Fushi's report also stated that this "Derivative Financial Instrument," or SWAP would be treated "in accordance with FAS No. 133, 'Accounting for Derivatives Instruments and Hedging Activity,' which requires the derivative to be carried on the balance sheet at fair value and to meet certain documentary and analytical requirements to qualify for hedge accounting treatment." Id. at ¶ 69. Fushi asserted that this "derivative qualifies for hedge accounting under FAS 133 and,

accordingly, changes in the fair value is reported in accumulated other comprehensive income, net of related income tax effects." Id. Plaintiffs cited the following statements from Fushi's Form 10-Q for the second quarter of 2007 about the April 10 SWAP as false:

> **The Company uses a cross currency hedge, a derivative financial instrument, to hedge the risk of rising interest rates on their variable interest rate debt. This type of derivative financial instrument is known as a cash flow hedge.** The Company accounts for this interest rate swap in accordance with FAS No. 133, "Accounting for Derivatives Instruments and Hedging Activity," which requires the derivative to be carried on the balance sheet at fair value and to meet certain documentary and analytical requirements to qualify for hedge accounting treatment. **The above derivative qualifies for hedge accounting under FAS 133 and, accordingly, changes in the fair value is reported in accumulated other comprehensive income, net of related income tax effects. Amounts included in accumulated other comprehensive income are reclassified into earnings when the hedged transaction effects earnings.**
>
> At the inception of the transaction, the Company documents the relationship between hedging instruments and hedged items, as well as its risk management objective and the strategy for undertaking various hedge transactions. This process includes linking all derivatives designated to specific firm commitments of forecast transactions. **The Company also documents its assessment, both at inception and on an ongoing basis, of whether the derivative financial instruments that are used in hedging transactions are highly effective in offsetting changes in fair values or cash flows of hedged items.**

Id. at ¶ 36 (emphasis in complaint).

Defendants note their disclosures about the nature, risks and the accounting treatment for this SWAP in Fushi's SEC Form 10-Q for the quarter that ended June 30, 2007:

> **The Company's operations are exposed to a variety of global market risks, including the effect of changing interest rates. This exposure is managed, in part, with the use of financial derivatives.**
>
>            \*      \*      \*
>
> To hedge exposures associated with the Guaranteed Senior Secured Floating Rate Notes due 2012 (2012 Note), on April 10, 2007, the Company entered into a cross currency swap transaction (the SWAP) with Merrill Lynch Capital Services, Inc. ("MLCS"). The Swap, with a notional principal value of $40 million, converts the LIBOR + 7% per annum USD variable interest rate to an 8.3% per annum RMB

fixed interest rate. . . . Under the terms of the cross currency swap, the Company receives variable interest rate payments in USD and makes fixed interest rate payments in RMB with a settlement netted in USD, thereby creating the equivalent of fixed-rate debt. MLCS requires the Company to deposit $1,000,000 with them to secure the agreement. The deposit may be increased to $3,000,000 if the exchange rate for RMB to USD falls below 6.5, and to $5,000,000 if the exchange rate falls below 5.5. This swap is designated and qualified as a cash flow hedge.

(Docket Entry No. 66-4 at 30-32) (emphasis added).[3]

According to Plaintiffs, for the SWAP to be "highly effective," GAAP standards require that at the inception of the SWAP, Fushi must expect that the changes in the variable rate of interest in U.S. dollars would be almost fully offset by the changes in the RMB/U.S. rate of exchange on the fixed rate interest, over the term of the SWAP. (Docket Entry No. 57, Amended Complaint at ¶ 38). Plaintiffs allege that "at the inception of the SWAP, as well as on an ongoing basis Fushi could not possibly expect that the changes in the LIBOR [London Interbank Offered Rate] would be almost fully offset by the changes in the RMB/U.S. exchange rate." Id. Thus, Plaintiffs allege that "[n]o rational person in the business could expect, for example, that a rise in the LIBOR would necessarily be accompanied by an offsetting change in the RMB/U.S. exchange rate, hand-in-hand." Id.

Plaintiffs' allegations are reflected in statements in Fushi's SEC Form 8-K, dated March 24, 2011, that its SWAP did not qualify under stated accounting standards, as Defendants earlier told investors. In a word, Fushi explained that this SWAP did not qualify for cash flow hedge accounting treatment because the SWAP did not provide an effective hedge against Fushi's variable rate interest payments on its high yield debt. The amended complaint states:

---

[3] Defendants also note that it was Frazer Frost, LLP, Fushi's independent auditor, that did not qualify any of its audit opinions nor issue any written statement questioning the Defendants' accounting treatment of the SWAP. See (Docket Entry No. 66-5, Jan. 24, 2011 Form 8-K).

On April 10, 2007, the Company entered into a cross currency swap transaction (the "SWAP") with Merrill Lynch Capital Services, Inc. Under the terms of the SWAP, the Company received variable interest rate (based on LIBOR [London Interbank Offered Rate, a rate based on the interest rates at which banks borrow unsecured funds from other banks in the London wholesale money market] plus 7% per annum and adjustable to LIBOR plus 5% per annum after a qualifying IPO) payments in USD [U.S. dollars] based on a notional amount of USD 40 million and made fixed interest rate payments in RMB which were translated into USD at foreign exchange rates on each settlement date. The fixed interest rate payment was based on the notional amount of RMB 310,900,000 at a fixed interest rate of 8.3% per annum. The SWAP required semi-annual payments in arrears on July 24 and January 24 and would mature on the earlier of (1) cash settlement defined as early termination or (2) January 24, 2012.

The Company originally intended to use the SWAP to hedge both variable interest risk of its outstanding high yield notes of USD 40 million, which bore interest at LIBOR plus 7% and adjustable to LIBOR plus 5.6% per annum after a qualifying IPO, and foreign currency risk of its operating subsidiaries in the People's Republic of China. **However, since the Company was not exposed to foreign currency risk on the high yield notes, the SWAP did not qualify for hedge accounting and all changes in fair value of the SWAP should have been recognized in earnings.**

**Due to the complexities of accounting for derivatives, the Company had misapplied the US GAAP and designated the SWAP as cash flow hedge against the USD 40 million high yield notes. The changes in fair value of the SWAP had been inappropriately accounted for in other comprehensive income rather than recognized in earnings prior to the SWAP being terminated on March 31, 2010.**

Id. at ¶ 34 (emphasis in complaint). Plaintiffs allege that Fushi was never exposed to foreign currency risk on its high yield notes. Id. at ¶ 45.

Plaintiffs also allege that "Fushi knew that the SWAP would cause the Company to be exposed to an additional foreign currency risk: on those interest payments in RMB" and "knew, therefore, that the SWAP could not possibly comport with the GAAP requirement that the SWAP be 'highly effective' at the inception of the transaction." Id. at ¶ 41. This foreign currency risk is based upon the interest payments in RMB. Id. This risk is reflected in Fushi's 2007 10-K Form that states: "[i]f the RMB depreciates against the US Dollar, the value of our RMB revenues and assets

as expressed in our US Dollar financial statements will decline." Id. In their amended complaint, Plaintiffs proffer a chart to depict Fushi's SWAP with Merrill Lynch. Id. at ¶ 43. Under the SWAP transaction, (1) Merrill Lynch agreed to pay Fushi the variable rate interest in U.S. dollars; (2) Fushi used such payment to pay the debt holders of Fushi's $40 million high yield notes; and (3) Fushi agreed to pay Merrill Lynch a fixed rate of interest in RMB. Id. at ¶ 44. Plaintiffs allege that the high yield notes and interest that Merrill Lynch paid Fushi were both in U.S. dollars. Id. at ¶ 45.

Moreover, the Plaintiffs allege that Fushi's reporting currency and functional currency in the United States were both in U.S. dollars. Id. at ¶ 45. Under such a transaction there is not any reasonable expectation that changes in the variable rate of interest in U.S. dollars would be almost fully offset by changes in the RMB/U.S. rate of exchange on the fixed rate interest over the SWAP's term. Id. at ¶ 44. Fushi's statement in its March 24, 2011 Form 8-K acknowledged that:

> [T]he Company was not exposed to foreign currency risk on the high yield notes, the SWAP did not qualify for hedge accounting and all changes in fair value of the SWAP should have been recognized in earnings.

Id. at ¶ 45.

Plaintiffs assert that at its inception and thereafter, Fushi knew that under this SWAP, changes in the LIBOR would be almost fully offset by the changes in the RMB/U.S. exchange rate. Id. at ¶ 46. Thus, the Defendants' improper accounting must have been either intentional or was done with reckless disregard of the actual facts and was not the product of an innocent mistake or mere error. Id. Plaintiffs further allege that as a result of the improper accounting of this SWAP, Fushi's financial statements were materially false and misleading from 2007 through the first quarter of 2010. Id. at ¶ 30.

Plaintiffs allege that Fushi knew or recklessly disregarded the fact that this SWAP was not qualified to use cash flow hedge because all criteria in Financial Accounting Standards ("FAS") 133 had to be met. Id. at ¶¶ 28-29, 37. Specifically, Plaintiffs cite the section titled *Accounting for Certain Derivative Instruments and Certain Hedging Activities*. Id. at ¶ 36. Fushi allegedly did not comply with this requirement that "[b]oth at [the] inception of the hedge and on an ongoing basis, the hedging relationship is expected to be highly effective in achieving offsetting cash flows attributable to the hedged risk during the term of the hedge." Id. (quoting FAS No. 133, ¶ 28b).

Plaintiffs allege that Defendants knew that treatment, disclosure, and reporting of the SWAP as a "cash flow hedge," was false and also knew that charges against net income could be improperly dodged. Id. at ¶ 39. Plaintiffs assert that this error was not due to complex accounting requirements because Fushi's SWAP used a "plain vanilla" foreign currency/cross currency interest rate swap that do not involve complex accounting rules. Id. at ¶ 42. For the characteristics of a plain vanilla swap, Plaintiffs allege:

> (a) Party A holds interest-bearing debt in the functional currency (U.S. dollars in Fushi's case), and seeks to hedge against foreign currency risk by engaging in a cross currency swap transaction with Party B, which holds interest-bearing debt in a foreign currency (RMB in Merrill Lynch's case);
>
> (b) The parties exchange the principal on the notional amounts at market rates, typically using the same exchange rate for the transfer at the inception of the transaction as is employed at the end of the swap transaction;
>
> (c) The two specified principal amounts are set so as to be approximately equal (based on the exchange rate at the time of the initial transaction);
>
> (d) Party A pays interest at the agreed upon rate to Party B on the notional foreign currency principal that was transferred to Party A;
>
> (e) Party B pays interest at the agreed upon rate to Party A on the notional U.S. currency principal that was transferred to Party B;

(f) At the termination of the swap, or maturity, the parties exchange the principal amounts, so that Party A receives its original principal in U.S. dollars and Party B receives its original principal in the foreign currency;

(g) The more the actual market foreign currency exchange rates have deviated from the contracted rates, the greater the potential for loss or gain; and

(h) The longer the term of the contract, the greater the potential volatility and loss or gain because of changes in foreign currency exchange rates over time.

<u>Id.</u>

With this SWAP, in 2007, Plaintiffs allege that Fushi was able to inflate net income by $5.6 million or 24% while evading reporting substantial losses that would otherwise have materially and adversely affected the Company's bottom line net income. <u>Id.</u> at ¶ 47. Fushi's restatements resulted in a decrease in Fushi's net income of $5.6 million in 2007; an increase in net income of $2.7 million in 2008; a decrease in net income of $2.1 million in 2009; and a decrease in net income of $5.0 million for the quarter ended March 31, 2010. <u>Id.</u> at ¶ 30. The cumulative financial impact of Fushi's improper SWAP accounting during the period from January 24, 2007 through March 31, 2010 represents an overstatement net income of $10.0 million. <u>Id.</u>

### b. Fushi's Acquisition Practices

On January 21, 2010, acting through its subsidiary Fushi International (Dalian) Bimettalic Cable Co. Ltd., Fushi announced its "'definitive agreement to acquire Dalian Jinchuan Electric Cable Co., Ltd. ("Dalian Jinchuan") for approximately $10.2 million,'" with "'the transaction to be finalized during the course of the first quarter 2010.'" <u>Id.</u> at ¶ 98. Fushi described Dalian Jinchuan as "'a leading Northeastern Chinese manufacturer of low- and medium-voltage power cables using copper, aluminum and copper-clad center conductors, [and had] reported 2008 revenues as audited under Chinese GAAP of approximately $18 million.'" <u>Id.</u> Fushi also stated that "'[t]he purchase

price of $10.2 million may be made, at the option of the Company, in cash and restricted stock of the Company over the next year.'" Id. In addition, Fushi also announced that "'[u]pon closing, the Company expects the acquisition of Dalian Jinchuan to be immediately accretive to earnings.'" Id.

Defendants note that in Fushi's SEC Form 10-Q issued on November 8, 2010, Fushi made the following disclosures about the Jinchuan acquisition: (1) The Company paid $5.075 million in cash to acquire Jinchuan, with additional payments of up to $5.075 million to be paid depending upon whether Jinchuan reached certain performance targets for 2010. See (Docket Entry No. 66-10 at 3, March 24, 2011 Form 8-K); (2) The Company retained an independent appraisal of Jinchuan by Liaoning Hongxing Appraisal, LLC ("Liaoning Hongxing") that appraised the fair value of Jinchuan's net assets at $13,455,950, approximately $3.3 million above the purchase price. (Docket Entry No. 66-11 at 50; and (3) in reliance upon this independent appraisal, the Company recognized a $3.3 million gain flowing from its "bargain acquisition" of Jinchuan. Id.

Fushi's February 1, 2010 press release announced the closing of a public offering of 7,475,000 shares of Fushi common stock at $8 per share, yielding net proceeds of $55.4 million (including the underwriters' over-allotment of 975,000 shares of common stock). (Docket Entry No. 57, Amended Complaint at ¶ 99). In reference to this offering, Fushi's May 4, 2010 press release stated:

> During the quarter, the Company successfully completed a secondary offering of 7.5 million shares of common stock, generating net proceeds of over $55 million. A portion of these proceeds was used to retire the Company's long-term debt, and the one-time loss in retiring this debt totaled $2.4 million ($1.6 million net of tax), or $0.07 per diluted share ($0.04 net of tax). Simultaneously, the Company terminated the cross currency interest rate swap, a derivative the Company used as a hedging instrument related to this long-term debt, and as a result recognized a realized loss of $6.7 million ($4.4 million net of tax), or $0.19 per diluted share ($0.12 net of tax) during the period. The termination of this swap enabled the Company to mitigate the risk of an appreciation in the renminbi. Lastly, during the first quarter the Company

14

completed its previously announced acquisition of Dalian Jinchuan Jinchuan and recognized a one-time non-cash gain of $3.3 million, or $0.09 per diluted share as the fair market value of Dalian assets exceeded the purchase price.

Id. at ¶ 105. Plaintiffs assert that the cash from this stock offering was used to continue Defendants' debt reductions while maintaining cash reserves around $79 million. Id. at ¶ 100.

On May 26, 2010, Fushi announced that its agreement to acquire 100% of Hongtai, a leading manufacturer of bimetallic wire in Southeast China, for approximately $3.9 million, with $1.3 million in cash and $2.6 million in restricted stock. Id. at ¶ 108. Fushi stated its expectation that the transaction would be finalized during the second quarter of 2010. Id. Fushi described Hongtai as "'a leading manufacturer of bimetallic wire in Southeast China, principally [CCA] and copper-clad aluminum magnesium.'" Id. Hongtai's net assets were stated to be at $5.7 million, approximately $1.8 million above the market price and with reliance upon this independent appraisal, Fushi recognized a $1.8 million gain flowing from its "bargain purchase" of Hongtai. (Docket Entry No. 66-11 at 52-3, November 8, 2010 Form 10-Q). Defendants cited the Liaoning Hongxing appraisal of the Jinchuan and Hontai acquisitions. Id.

On December 3, 2010, financial analysts at Jefferies & Company reported Fushi's decreasing stock value citing "the discovery of potential accounting irregularities at a different Chinese-based U.S. traded company that is audited by the same firm [Fushi] uses." (Docket Entry No. 57, Amended Complaint at ¶ 115). The Jefferies analyst also noted that Fushi acted to offset this concern and "reiterated to [Jefferies] its confidence in its accounting policies and their application." Id. (emphasis omitted). Based upon these accounting irregularities, Plaintiffs allege that Fushi's SEC reports, statements on conference calls, and press statements about its financial conditions were materially

15

misleading and did not fairly represent Fushi's actual financial condition during the Class Period. Id. at ¶¶ 75, 88, 104, 116.

Plaintiffs allege that Fushi did not reassess whether the assets acquired and liabilities assumed were correctly identified, as required by FAS No. 141R, ¶ 38. Id. at ¶ 53. Plaintiffs allege Fushi violated GAAP by (1) materially overstating "the fair value of certain property, plant and equipment" that Fushi acquired in its purchases of Dalian Jinchuan Jinchuan and Hongtai; (2) improperly treated these acquisitions as "bargain" purchases under Fushi's purchase price accounting; and (3) improperly recognized gains on these transactions. Id. (citing Form 8-K, Mar. 24, 2011). According to the amended complaint, a "bargain" purchase occurs when the fair value of the acquired net assets in a business combination exceeds the consideration the acquirer paid. Id. at ¶ 49. Plaintiffs allege that such bargain purchases are rare and unusual, citing FAS No. 141R on the accounting rules regarding such purchases:

> **The Boards [i.e., the FASB and then International Accounting Standards Board or "IASB"] consider bargain purchases to be anomalous transactions – business entities and their owners generally do not knowingly and willingly sell assets or businesses at prices below their fair values.**
>
> FAS No. 141R, ¶371. A bargain purchase might happen, for example, in a business combination that is a forced sale in which the seller is acting under compulsion.
>
> FAS No. 141R, ¶37.Circumstances in which they [bargain purchases] occur include a forced liquidation or distress sale (for example, after the death of a founder or key manager) in which owners need to sell a business quickly, which may result in a price that is less than fair value.
>
> FAS No. 141R, ¶B371.**The appearance of a bargain purchase without evidence of the underlying reasons would raise concerns in practice about the existence of measurement errors. FAS. No. 141R, ¶B372.**

Id. at ¶¶ 50-51 (emphasis in complaint).

Plaintiffs assert that the Financial Accounting Standards Board ("FASB") distinguishes between a "bargain" purchase and measurements errors:

**The Boards [FASB and IASB] acknowledged concerns raised by constituents that a requirement to recognize gains on a bargain purchase might provide an opportunity for inappropriate gain recognition from intentional errors resulting from the acquirer's:**

> a. Understating or failing to identify the value of items of consideration that it transferred
> b. Overstating values attributed to particular assets acquired
> c. Understating or failing to identify and recognize particular liabilities assumed.

The Boards think that problems surrounding intentional measurement errors by acquirers generally are best addressed by means other than setting standards specifically intended to avoid abuse. **Strong internal control systems and the use of independent valuation experts and external auditors are among the means by which both intentional and unintentional measurement errors are minimized. Standard specifically designed to avoid abuse would inevitable lack neutrality. (See paragraph B51 for a discussion of the need for neutrality in accounting and accounting standards.) However, the Boards share constituents' concerns about the potential for inappropriate gain recognition resulting from measurement bias or undetected measurement errors. Thus, the Boards decided, as specified in paragraph 38, to require the acquirer to reassess whether it has correctly identified all of the assets acquired and all of the liabilities assumed before recognizing a gain on a bargain purchase.** The acquirer then must review the procedures used to measure the amounts this Statement requires to be recognized at the acquisition date for all the following:

> a. The identifiable assets acquired and liabilities assumed
> b. The noncontrolling interest in the acquiree, if any
> c. For a business combination achieved in stages, the acquirer's previously held equity interest in the acquiree
> d. The consideration transferred.

**The objective of that review is to ensure that appropriate consideration has been given to all available information in identifying the items to be measured and recognized and in determining their fair values. The Boards believe that the required review will mitigate, if not eliminate, undetected errors that might have existed in the initial measurements.** FAS No. 141R, ¶¶B374-75.

<u>Id.</u> at ¶ 51 (emphasis added).

Plaintiffs also cite FASB procedures describe how to determine if a "bargain" purchase is legitimate or permissible:

> Before recognizing a gain on a bargain purchase, the acquirer shall reassess whether it has correctly identified all of the assets acquired and all of the liabilities assumed and shall recognize any additional assets or liabilities that are identified in that review. The acquirer shall then review the procedures used to measure the amounts this Statement requires to be recognized at the acquisition date for all of the following:
>
>> a. The identifiable assets acquired and liabilities assumed
>> b. The noncontrolling interest in the acquiree, if any
>> c. For a business combination achieved in stages, the acquirer's previously held equity interest in the acquiree
>> d. The consideration transferred.
>
> The objective of the review is to ensure that the measurements appropriately reflect consideration of all available information as of the acquisition date. FAS No. 141R, ¶ 38.

Id. at ¶ 52.

Plaintiffs assert that GAAP expressly warns financial statement preparers that "bargain" purchases are "anomalous" and advises that the fair value measurements for such purchases should be investigated and rechecked for overstatements of net assets. Id. at ¶ 31. Plaintiffs assert that Fushi did not heed FASB's warnings about bargain purchases and did not maintain internal control systems to minimize intentional and unintentional errors. Id. Plaintiffs allege that Fushi knew the valuations of these acquired net assets were likely materially inflated. Id. Thus, Plaintiffs allege that the Defendants' statements of the value of these acquisitions were false or the Defendants recklessly disregarded the facts and circumstances of the values of these acquisitions. Id. As a result, Plaintiffs allege that Fushi's statements in documents, including its 2007 Form 10-K about effective internal control over financial reporting during the relevant time period, were false and misleading. Id. at ¶ 30. Plaintiffs further allege that Fushi was motivated to treat the purchases as "bargain"

purchases to recognize gains of $3.3 million in the first quarter and $1.8 million in the second quarter of 2010. Id. at ¶ 31. Plaintiffs characterize these Fushi gains as "bogus," because Fushi was required to restate its financial statements as a result of the allegedly false and misleading financial statement resulting from the purchases. Id. at ¶ 31-32. These restatements allegedly reduced Fushi's earnings by $3.3 million in the first quarter and $1.8 million in the second quarter of 2010, resulting in a $5.1 million overstatement of Fushi's gains. Id. Plaintiffs allege that Fushi failed to recognize approximately an additional $1.7 million of goodwill ($1.1 million from Dalian Jinchuan and $0.6 million from Hongtai) on its balance sheets for the second quarter of 2010. Id.

### c. The Restatements

Between 2007 and January 24, 2011, Fushi's independent accounting firm was Frazer Frost, LLP. Plaintiffs allege that on January 24, 2011, Fushi announced that its replacement of Frazer Frost with KPMG as Fushi's registered independent public accounting firm. Id. at ¶ 142. Frazer Frost allegedly served as Fushi's accounting firm in each of the years that were restated. Id. In its January 24, 2011 SEC Form 8-K Fushi announced that "Frazer's report on the Company's financial statements for the fiscal years ended December 31, 2008 and 2009 contained no adverse opinion or disclaimer of opinion, nor was it qualified or modified as to uncertainty, audit scope or accounting principal." (Docket Entry No. 66-5 at 2). In addition, Fushi's report stated, "[d]uring the period from January 1, 2008 through the date of Frazer's dismissal, there were no disagreements with Frazer on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Frazer, would have caused Frazer to make reference to the subject matter of the disagreements in connection with Regulation S-K." Id.; see also (Docket Entry No. 57, Amended Complaint at ¶ 142).

19

Fushi allegedly emphasized that this change was not the result of a disagreement with Frazer Frost and Frazer Frost's prior reports on Fushi's financial statements were accurate. Id. Plaintiffs allege that KPMG immediately discovered that Fushi's prior financial statements for 2007-2009 and the first three quarters of 2010 were false. Id. at ¶ 143. Plaintiffs assert that this quick discovery supports an inference of scienter against the Defendants. Id. Plaintiffs also cite former high-level Fushi executive who has knowledge of Fushi's executive team's operation during the Class Period and Fushi's accounting staff's alleged discomfort with their instructions. Id. at ¶ 134. Plaintiffs allege that an executive in accounting told another former Fushi executive that Fushi's accounting personnel were uncomfortable with the accounting treatments at Fushi, including Fu's sole authority to authorize payment or to move money. Id. The former executive allegedly stated that accounting personnel were worried about going to jail if they conducted the accounting as directed by the Defendants. Id.

On March 11, 2011, after the closure of the market, Fushi announced its reevalaution of its accounting treatment of its SWAP and its "bargain purchase" acquisitions of Dalain Jinchuan and Hongtai. Id. at ¶ 117. In addition Fushi announced its inability to meet SEC rules to file its Form 10-K by the deadline Id. As discussed below, Fushi announced its projected positive financial performance and provided a reason for its stock value decrease. Fushi also stated that "since the Company was not exposed to foreign currency risk on the high yield notes, the SWAP did not qualify for hedge accounting and all changes in fair value of the SWAP should have been recognized in earnings."(Docket Entry No. 66-15 at 2, March 24, 2011 Form 8-K). As to the acquisitions, Fushi announced that "[d]uring the year-end closing process, management of the Company identified certain errors in the original purchase price allocation with respect to the fair value of certain

property, plant and equipment the Company acquired in the Hongtai and Jinchuan acquisitions." Id.
In its March 11, 2011 Form 8-K, Fushi stated that although the accounting treatments in question related only to non-cash and non-operating items, the Company's review would result in a delay in the filing of the Company's annual Form 10-K. Id. 66-14 at 5, Mar. 22, 2011 Form 8-K.

On March 11, 2012 Fushi stock closed at $9.42 and for the next two months fell to $5 to $7 a share. (Docket Entry No. 69, Defendants' Memorandum in support of Motion to Dismiss at 33). Defendants note the Tsunami that struck Japan on March 11, 2012 that had an adverse effect on the Asian stock, but on March 14, 2012, Fushi's stock price was $8.98 a share. Id. On March 29, 2011, Fushi disclosed that restatements of its financial statement would be forthcoming for 2007 through the first three quarters of 2010. These restatements revealed that in 2007, Fushi's income was overstated 24%; in 2009 by 10% and the second quarter by 9%. Fushi states that its net income was understated in 2008 by 9% and 19% for the first and third quarters of 2010. Id. at 16.

Plaintiffs allege that in its press release about its reevaluations of the application of GAAP and certain accounting treatments of its SWAP and acquisitions for its 2007-2009 financial results and the financial statements, the Defendants stated:

> These accounting treatments are related to the ability to realize deferred income tax assets, qualification of cash flow hedge for cross-currency interest swap, and bargain purchase gains recognized in 2010 acquisitions. As a result of the additional time needed to study these items, the Company expects to file a Notification of Late Filing under Rule 12b-25 of the Securities Exchange Act of 1934 with the SEC for an extension of its Annual Report on Form 10-K for the year ended December 31, 2010.

> Mr. Joe Longever, co-Chief Executive Officer of Fushi Copperweld, commented, "In the process of preparing our financial statements for the year ended December 31, 2010, management reevaluated the application of GAAP in certain past accounting treatments, which are non-cash and non-operating items. While it is unfortunate that these reconsiderations are causing a delay in our filing, we stress the fact that these are all non-cash adjustments related to various corporate-level account treatments and

will not materially affect our non-GAAP, core operating results such as revenue,
gross profit and operating income."

(Docket Entry No. 57, Am. Compl. at ¶ 117). Fushi's press release also assured investors of the

strength of Fushi's business as reflected in Defendant Longever's statement:

> "We ended a good year on a very strong note, with financial results that we expect
> will exceed our previous expectations, including our first ever profitable fourth
> quarter at Fayetteville despite seasonal weakness. Volume increases at Fayetteville
> were driven by stronger demand, particularly for grounding products that serve the
> utility industry, and from more diverse market demand in Europe, South America,
> the Middle East and North Africa. While our business in China was affected by the
> continued slowdown of the 3G build-out, our diversified business model, product line
> and global market opportunity helped to offset this factor. Record copper prices also
> positively contributed to our performance as buyers increasingly look for a quality
> substitute for pure copper applications."

* * *

> "Looking ahead, we are excited by our prospects for 2011. With an improving
> macroeconomic environment, stronger production coming from Fayetteville, added
> capacity in Dalian Jinchuan to serve the broader Asian market opportunity, a solid
> initial response to our CCS product offering in China, and increasing global demand
> for our products serving the utilities industry, we believe we are well positioned to
> prosper and grow. As a result, we expect our utilization, volumes, and operating
> profit will continue to improve in 2011 and beyond."

Id. at ¶ 118. In response to the announcement of the restatements, Fushi stock allegedly dropped

2.3% that Plaintiffs attribute to the exposure of the artificial inflation of the stock price. Id. at ¶ 124.

Fushi's stock closed on March 11, 2011 at $9.42 and opened on March 14, the next trading day, at

$8.98 and remained at $8's for the ensuing two months, but fell to the $5 to $7 range until closing

at $8.27 on February 9, 2012. (Docket Entry No. 69, Defendants' Memorandum in Support of

Motion to Dismiss at 33).

Financial analysts Rodman & Renshaw allegedly noted the first quarter results as

disappointing:

> 1Q11 EPS of $.18 missed our EPS estimate of $.28 by $.10. **The company reported earnings significantly below our expectations on lower than expected gross margins,** additional audit fees and advisory expenses related to the proposed management buyout offer, and a higher than anticipated effective tax rate for the quarter. . . . **Consequently, the company posted a 39.3% [year-over-year] decline in non-GAAP net income to $7.0 million or $0.18% per fully diluted share. GAAP net income declined 24.7% [year-over-year] to $6.8 million or $0.18 per fully diluted share.**

(Docket Entry No. 57, Amended Complaint at ¶ 127 (emphasis added)). Plaintiffs assert that as a result of this disappointment, the value of Fushi stock dropped an additional 3.4%. Id. at ¶ 131.

Plaintiffs allege that by March 14, financial analysts responded to this news of Fushi's delay in filing of the Form 10-K as a "concern." Id. at ¶ 119. Plaintiffs allege that financial analysts at Jeffries issued a second report after the market closed that day, downgrading Fushi from "BUY" to "HOLD" because of "concern over the company's need to review accounting." Id. Plaintiffs allege that with this news, Fushi shares dropped 18%, but did not collapse completely because of the alleged artificial inflation caused by the misleading statements. Id. at ¶ 120.

Plaintiffs allege that on March 29, 2011, Fushi filed a Form 8-K with the SEC disclosing that Fushi's audit committee had concluded that the previously reported financial statements for the years ended December 31, 2009, 2008, and 2007 and its unaudited interim financial statements for the quarters ended March 31, 2010, June 30, 2010, and September 30, 2010 should be restated and should no longer be relied upon. Id. at ¶ 121. Fushi stated that this restatement was due to the misapplication of the GAAP to the SWAP and the acquisitions of Dalian Jinchuan and Hongtai. Id. Plaintiffs cite Jeffries analysts' statements that "we do consider [the restatements] material to earnings, as they all exceed 8%." Id. at ¶ 123.

According to Plaintiffs, a result of the accounting errors was that Fushi's net income was overstated in 2007 (by 24%), 2009 (by 10%), and the second quarter of 2010 (by 9%); was

understated in 2008 (by 9%); overstated in the first and third quarters of 2010 by 19%. Id. at ¶ 33. Plaintiffs note that Fushi missed its projected nonGAAP income by 39%. Id. at ¶ 127. The value of plant and equipment was overstated by approximately 4% over the first three quarters of 2010, and goodwill was undervalued by 100% during that time period with the net effect on the value of total assets of a 1% overstatement. Id. at ¶ 33; (Docket Entry No. 66-16 at 50; 66-17 at 35; 66-19 at 41). Defendants note that for the putative class period, the total overstatement of Fushi's net income is 4%. (Docket Entry No. 69, Defendants' Memorandum at 23).

Plaintiffs assert that Defendants' decision to adjust Fushi's previous financial statements is an admission that the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading and that the financial statements reported during the Class Period were incorrect based on information available to the defendants at the time the results were originally reported. (Docket Entry No. 57, Amended Complaint at ¶ 122).

Plaintiffs allege that on May 2, 2011, in spite of the delay and allegedly because of the positive statements about 2011, financial analysts at Roth Capital Partners ("Roth") expected Fushi to meet expectations for the first quarter of 2011. Id. at ¶ 125. On May 4, 2011, Fushi issued a press release on its first quarter 2011 financial results, with $65.9 million reported revenue and $6.8 million, or $0.18 diluted EPS, below the alleged analyst estimate of $0.23. Id. at ¶ 126.

Fushi's release attributed its lack of performance to customers not stocking Fushi products at the same levels as past quarters and customers were drawing down on their inventories. Id. Defendant Longever's actual statement was:

> Our first quarter is typically our slowest period of the year, and our result for the period reflect this seasonality combined with an

24

improving but still uncertain economic environment, as the continued slowdown in the Chinese 3G build-out and our sales mix again reflects a shift to more utility customers. **We have also seen a break from typical buying patterns, with customers continuing to draw down on their inventories and restocking at only minimal levels.** While infrastructure spending priorities to shift raw material pricing remains volatile, we continue to see customers attracted to out unique products for their technological superiority and economic value.

. . . Looking ahead, we expect these conditions to continue, namely a slowly improving global economic recovery marked by resurgence in some markets and continued struggling in others.

Id. at 146 (emphasis added). Plaintiffs assert that this characterization about inventory is refuted by former Fushi employees. According to Plaintiffs, a former high-level Fushi executive reports that during the Class Period that Fushi's customers do not keep inventory on hand nor have warehouses for inventory, and only purchase products for immediate use. Id. at ¶ 128. A former Fushi sales representative employed during the Class Period also allegedly stated that customers did not sit on inventory. Id.

### d. Fushi's Internal Controls

Plaintiffs assert that Fushi's failure to implement a "Western style" of internal controls contributed to the Defendants' alleged wrongdoing. Id. at ¶ 55. Quoting Fushi's SEC Form 10-K from 2007, Plaintiffs allege an awareness of the deficiency on the part of Fushi: "PRC [People's Republic of China] companies have historically not adopted ... a Western style of management and financial reporting concepts and practices,... which includes strong corporate governance, internal controls and, computer,...financial and other control systems.... T]here have been historical deficiencies with our internal controls . . . ." Id. at ¶ 56. Plaintiffs cite three deficiencies in Fushi's internal control structure: (1) lack of independent evaluation and analysis of the substance and nature of the underlying transactions; (2) lack of assessments and responses to the risks of inaccurate

financial reporting; and (3) failures to monitor the accuracy of the data for the SWAP and the acquisitions of Dalian Jinchuan and Hongtai. Id. at ¶ 57. Plaintiffs assert that Fushi's failure was contrary to the 1934 Act Rules 13a-15(f) and 15d-15(f) that require management of public companies to establish and maintain adequate internal control over financial reporting. Id. at ¶ 65. Rule 13a-15(f) of the 1934 states:

> [T]he term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Id.

Plaintiffs allege that during the class period, Fushi represented that its internal controls of financial reporting were effective because of its utilization of Committee of Sponsoring Organizations of the Treadway Commission ("COSO") criteria in Fushi's "Internal Control-Integrated Framework." Id. at ¶ 56. Plaintiffs assert that in fact, Fushi failed to comply with essential components of COSO. Id. at ¶ 57. In particular, Plaintiffs allege that Defendants Fu, Longever, and Wang falsely stated that internal controls were in place to ensure the reliability of Fushi's financial reporting and that those internal controls were in accordance with COSO standards. Id. Plaintiffs's specific allegations on Fushi's deficiencies and the Defendants' violation of COSO standards are the lack of the following:

> *Risk Assessment* – Risks are analyzed, considering likelihood and impact, as a basis for determining how they should be managed. Risks are assessed on an inherent and a residual basis.
>
> *Risk Response* – Management selects risk responses – avoiding, accepting, reducing, or sharing risk – developing a set of actions to align risks with the

entity's risk tolerances and risk appetite.

*Control Activities* – Policies and procedures are established and implemented to help ensure the risk responses are effectively carried out.

*Information and Communication* – Relevant information is identified, captured, and communicated in a form and timeframe that enable people to carry out their responsibilities. Effective communication also occurs in a broader sense, flowing down, across, and up the entity.

*Monitoring* – The entirety of enterprise risk management is monitored and modifications made as necessary. Monitoring is accomplished through ongoing management activities, separate evaluations, or both."

Id. (emphasis in complaint).

Plaintiffs assert that Fushi's internal control failure were egregious because: (1) the SWAP and the two "bargain" purchases were highly unusual transactions for Fushi; (2) the pertinent GAAP standards for those transactions are not complex; and (3) Fushi's accounting treatments of the transactions "conveniently" resulted in material overstatements of Fushi's net income during the relevant period, particularly in the year of those transactions. Id. at ¶ 58. Plaintiffs further allege that according to a former high-level executive at Fushi, Defendant Fu maintained sole control over Fushi's finances and expenditures and thereby caused the violations of the COSO internal control principles requiring segregation of duties and independent checks for these transactions. Id. at ¶ 59.

### e. Sarbanes-Oxley Certifications

Defendant Wang filed Fushi's August 14, 2007 Form 10-Q for the preceding quarter with details of Fushi's financial results for the quarter with certifications required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). Defendants Fu and/or Wang signed each certification that stated:

1. I have reviewed this report on Form 10-Q of Fushi International, Inc;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter [the registrant's fourth fiscal quarter in the case of an annual report] that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Id. at ¶¶ 64, 68.

Additional Sarbanes-Oxley certifications with substantially similar statements are in Fushi's 10-Q and 10-K Forms dated March 12, March 17, May 14, August 13, and November 13, 2008; March 16, May 11, August 10, and November 9, 2009; March 16, May 7, August 10, and November 8, 2010. Id. at ¶¶ 71, 74, 78, 81, 84, 87, 91, 94, 97, 103, 107, 111, 114. Defendants other than Fu and Wang signed these forms on three occasions: (1) the November 9, 2009 Form 10-Q signed by Defendants Fu and Zhang; (2) the March 1, 2010 Form 10-K signed by Defendants Fu, Wang, and Longever; and (3) the November 8, 2010 Form 10-Q signed by Defendants Fu and Studwell. Id.

Plaintiffs allege that the Defendants' Sarbanes-Oxley certifications included specific certifications of their evaluations of: (1) Fushi's disclosure controls and internal controls over its financial reporting, and (2) the effectiveness of Fushi's disclosure controls and internal controls over its financial reporting. Id. at ¶ 64. Plaintiffs assert that these certifications were false for the last three quarters of 2007, all of 2008 and 2009, and the first three quarters of 2010. Id. Plaintiffs allege that Fushi admitted on April 5, 2011 in its delayed SEC Form 10-K for the year ending December 31,

2010, that the previously reported financial statements for the years 2007-2009 and its unaudited interim financial statements for the quarters first three quarters of 2010 were materially false, should be restated, should no longer be relied upon, and its internal controls were ineffective. Id. at ¶ 75.

Plaintiffs further alleges that these certifications were false because (1) the Defendants admitted that Fushi's financial reporting regarding the SWAP and the two "bargain" purchases materially overstated Fushi's net income; (2) Defendants knew that Fushi did not comply with GAAP; (3) Defendants knew that Fushi's internal controls were inadequate and that Fushi failed to comply with COSO requirements; and (4) Fushi's Forms 10-Q/10-K for the periods in question did not comply with Rule 13a-15 of the 1934 Act that the "issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter." Id. at ¶ 65.

Plaintiffs assert that if the Defendants had actually reviewed and evaluated Fushi's internal control over financial reporting, as stated in their Sarbanes-Oxley certifications, then the Defendants would have discovered the cited issues with the SWAP and bargain purchases as well as the internal control deficiencies on these transactions. Id. at ¶ 66. Thus, Plaintiffs assert that the Defendants either knew of the alleged misstatements or knowingly failed to perform their stated reviews of Fushi's finances, internal controls and disclosure controls. Id. Plaintiffs assert that Defendants therefore acted with knowledge or reckless disregard as to the falsity of the Sarbanes-Oxley certifications when they signed them. Id.

### f. Misstatements and Omissions

Plaintiffs allege Fushi's alleged misstatements were material misrepresentations about

Fushi's actual financial conditions in the last three quarters of 2007, the years of 2008 and 2009, and the first three quarters of 2010. Id. at ¶ 60. Plaintiffs also submit the following chart as a summary of Fushi's alleged financial misstatements:

**Fushi Copperweld Inc. and Subsidiaries**
**Summary of Fushi's Key Financial Misstatements**
**(All Figures in U.S. Dollars, Except Percentages)**

| | Net Income | Bargain Purchase Gain | Plant and Equipment | Goodwill | Total Assets |
|---|---|---|---|---|---|
| Year ended 12/31/2007; as Reported | 29,505,627 | | | | |
| Year ended 12/31/2007; as Restated | 23,885,466 | | | | |
| Year ended 12/31/2007; Amount Over/(Under)stated | 5,620,161 | | | | |
| Year Ended 12/31/2007; Percentage Over/(Under)stated | 24% | | | | |
| | | | | | |
| Year ended 12/31/2008; as Reported | 28,474,509 | | | | |
| Year ended 12/31/2008; as Restated | 31,205,800 | | | | |
| Year ended 12/31/2008; Amount Over/(Under)stated | (2,731,291) | | | | |
| Year Ended 12/31/2008; Percentage Over/(Under)stated | (9%) | | | | |
| | | | | | |
| Year ended 12/31/2009; as Reported | 23,994,386 | | | | |
| Year ended 12/31/2009; as Restated | 21,911,788 | | | | |
| Year ended 12/31/2009; Amount Over/(Under)stated | 2,082,598 | | | | |
| Year Ended 12/31/2009; Percentage Over/(Under)stated | 10% | | | | |
| | | | | | |
| Quarter ended 03/31/2010; as Reported | 7,370,760 | 3,305,013 | 125,677,015 | | 331,002,731 |
| Quarter ended 03/31/2010; as Restated | 9,072,539 | 0 | 121,844,394 | 567,892 | 327,738,002 |
| Quarter ended 03/31/2010; Amount Over/(Under)stated | (1,701,779) | 3,305,013 | 3,832,621 | (567,892) | 3,264,729 |
| Quarter Ended 03/31/2010; Percentage Over/(Under)stated | (19%) | N/A | 3% | (100%) | 1% |
| | | | | | |
| Quarter ended 06/30/2010; as Reported | 13,439,809 | 1,765,376 | 130,964,932 | | 348,069,517 |
| Quarter ended 06/30/2010; as Restated | 12,317,143 | 0 | 125,365,827 | 1,669,789 | 343,525,029 |

| | | | | | |
|---|---|---|---|---|---|
| Quarter ended 06/30/2010; Amount Over/(Under)stated | 1,122,666 | 1,765,376 | 5,599,105 | (1,669,789) | 4,544,488 |
| Quarter Ended 06/30/2010; Percentage Over/(Under)stated | 9% | N/A | 4% | (100%) | 1% |
| Quarter ended 09/30/2010; as reported | 12,870,762 | | 129,748,890 | | 387,416,290 |
| Quarter ended 09/30/2010; as restated | 12,922,371 | | 124,275,549 | 1,669,789 | 382,997,566 |
| Quarter ended 09/30/2010; Amount Over/(Under)stated | (51,609) | | 5,473,341 | (1,669,789) | 4,418,724 |
| Quarter Ended 09/30/2010; Percentage Over/(Under)stated | 0% | | 4% | (100%) | 1% |
| Total 01/01/2007 - 09/30/2010; As Reported | 115,655,853 | | | | |
| Total 01/01/2007 - 09/30/2010; As Restated | 111,315,107 | | | | |
| Total 01/01/2007 - 09/30/2010; Amount Over/(Under)stated | 4,340,746 | | | | |
| Total 01/01/2007 - 09/30/2010; Percentage Over/(Under)stated | 4% | | | | |
| Total 03/30/2010 - 09/30/2010; As Reported | | | 386,390,837 | 0 | 1,066,488,538 |
| Total 03/30/2010 - 09/30/2010; As Restated | | | 371,485,770 | 3,907,470 | 1,054,260,597 |
| Total 03/30/2010 - 09/30/2010; Amount Over/(Under)stated | | | 14,905,067 | (3,907,470) | 12,227,941 |
| Total 03/30/2010 - 09/30/2010; Percentage Over/(Under)stated | | | 4% | (100%) | 1% |

Id. at ¶ 33.

Plaintiffs cite concepts and standards from the SEC's Staff Accounting Bulletin ("SAB") No.

99, issued in August 1999:

(a) Registrants and auditors may not rely solely on quantitative criteria to evaluate an item's materiality;

(b) The materiality of items can be determined reliably only if they are evaluated both individually and collectively; and

(c) An intentional misstatement may be illegal even if the item it concerns is immaterial

32

Id. at ¶ 61.

Plaintiffs assert that SAB No. 99 also requires a full analysis of all relevant considerations, rather than a simple quantification of the magnitude of misstatement. Id. at ¶ 62. Under SAB No. 99 a reasonable person standard applies to determine if a matter is material. Id. Plaintiffs assert Defendants' statements characterizing accounting errors as "quantitatively small" are material misstatements necessary to conceal failures to meet expectations, to smooth earnings artificially, or to give a false impression of earnings stability. Id. at ¶ 63. For materiality, Plaintiffs also focus on the quantitative value of the misstatement in the year of each pertinent transaction. Id.

Aside from the evaluations of these acquisitions, Plaintiffs also allege a former high-level Fushi executive stated that Defendant Fu had ownership interests in Dalian Jinchuan and Hongta. Id. at ¶ 54. According to Plaintiffs, Fu's ownership interests in these companies that Fushi purchased, cause violations of GAAP requirements on purchases of a related company:

> "Examples of related party transactions include transactions between . . . an enterprise and its principal owners, management, or members of their immediate families . . . .
>
> ""Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated."
>
> **Financial statements shall include disclosures of material related party transactions**, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business." FAS No. 57, *Related Party Disclosures*, ¶¶1-3.

As to the extent of disclosures, GAAP provides:

"The disclosures shall include: . . . [t]he nature of the relationship(s) involved . . . [a] description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements . . . [and] [a]mounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement." FAS No. 57, ¶2.

Id. (emphasis in complaint). Defendants filed a recent Fushi SEC report that acknowledges Fu's ownership interests in these entities. (Docket Entry No. 106, attachments thereto).

Plaintiffs identify former high-level Fushi executives who left Fushi during the Class Period to avoid association with Fushi's misrepresentations to investors. Id. at ¶ 144. Plaintiffs refer to a former Fushi executive who was instructed to inform potential investors of numerous capital improvements Fishi would be making with proceeds from the $39 million private placement that closed in October 2007. Id. According to Plaintiffs, this former Fushi executive stated that the promised capital improvements were not made after those funds were transferred to China. Id. at ¶ 145. Plaintiffs allege that Defendant Fu who does not speak English, utilized Daniel Zhou, a Fushi sales representative, as an interpreter to inform this former Fushi executive in multiple meetings that the money would be freed for these capital improvements. Id. at ¶ 146. Yet, Fu never acted on those representations. Id. Plaintiffs allege that this executive left Fushi seven months into a two year term because this executive did not want to be associated with misrepresentation to investors and believed such statements could not be made in good faith to investors because the improvements were not to be implemented. Id.

### 3. Individual Defendants

Plaintiffs assert that the Individual Defendants acted knowing or with reckless disregard of the false nature of Fushi's public documents and statements about Fushi's actual financial condition as well as the Defendants' dissemination of these false statements to the investing public. Id. at ¶ 133. Plaintiffs allege that the Individual Defendants' behavior constituted substantial participation or acquiescence in violations of federal securities laws. Id. at ¶ 133. Accordingly, Plaintiffs state:

> [D]efendants, by virtue of their receipt of information reflecting the true facts regarding Fushi, their control over, and/or receipt and/or modification of Fushi's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fushi, participated in the fraudulent scheme alleged herein.

Id.

### a. Defendant Fu

Fu was Fushi's chief executive officer from December 2005 through November 2009, and thereafter was Fushi's co-chief executive officer. Id. at ¶ 18. Since December 2005 Fu also served as Fushi's chairman of its board of directors. Id. As pertinent here, Fu prepared and signed Fushi's SEC 10-K Forms. Id. In October and November 2008, Fu sold 10% of his Fushi shares. Id. at ¶ 137. In 2009, engaged in stock backed borrowing by pledging 7 million shares of Fushi stock for a $15 million loan with J.P Morgan. Id. at ¶ 136. Plaintiffs allege Fu's "personal business" loans were devices to inflate Fushi's stock. Id. For this contention, Plaintiffs cite the Roth's financial analysts' statement:

> In January 2009, Wise Sun Investment, where [Fu] is the 100% shareholder, entered into a Loan Agreement with an Asia asset management company to extend credit of up to $15M secured by 7M shares of common stock pledged by Wise Sun. As part of the transaction, Mr. **Fu provided a personal guarantee of the loan. We believe the loan was for Mr. Fu's personal business purpose, as he did with JP Morgan earlier. Should there [be] a significant decline in [Fushi] share prices which triggers a margin call, the pledge may sell these pledged shares to satisfy the loan demand, which will add tremendous selling pressure.**

Id. (emphasis in original and added).

On February 10, 2009, as Fushi's chairman and chief executive officer, Defendant Fu filed a Schedule 13D/A that announced that between October 22 and November 3, 2008, Fu sold 1,099,835 shares of Fushi common stock in the open market for a total consideration of $4,744,979. (Docket Entry No. 66-6 at 5). According to the amended complaint,

### C. Defendant Fu's Personal Loans – Secured by His Fushi Stock – Created an Incentive for Fraud and Strongly Supports an Inference of Scienter

136. Defendant Fu had an additional motive to inflate Fushi's stock price during the Class Period. He had taken out "personal business" loans – including one for $15 million secured by 7 million shares of his Fushi stock and another with JP Morgan. These loans created tremendous pressure to inflate – or at least maintain – Fushi's stock price. According to financial analysts at Roth:

> In Jan 2009, Wise Sun Investment, where [Fu] is the 100% shareholder, entered into a Loan Agreement with an Asia asset management company to `extend credit of up to $15M secured by 7M shares of common stock pledged by Wise Sun. As part of the transaction, Mr. Fu provided a personal guarantee of the loan. We believe the loan was for Mr. Fu's personal business purpose, as he did with JP. Morgan earlier. ***Should there [be] a significant decline in [Fushi] share prices which triggers a margin call, the pledge may sell these pledged shares to satisfy the loan demand, which will add tremendous selling pressure.***

In other words, if Fushi's stock price dropped, Fu's lender could require that Fu sell the pledged shares – which would in turn drive the price of Fushi shares even lower – and cause Fu's net worth to sharply decline. Thus, Fu's personal loans created tremendous pressure to inflate Fushi's stock price.

### D. Defendant Fu's Insider Sales Strongly Supports an Inference of Scienter

137. Defendant Fu was further motivated to engage in this course of conduct in order to sell 1,099,835 shares of his personally held Fushi stock in October and November of 2008 and thereby reap $4,764,790 in insider trading proceeds.

### E. Defendant Fu's Millions of Dollars of Loans to Fushi Created an Incentive for Fraud and Supports an Inference of Scienter

138. During the Class Period defendant Fu loaned Fushi over $35 million – at zero interest – of his own money. In September 2010, Fu, "advanced $15 million to Fushi to assist it in the establishment of Fushi JiangSu, a wholly-owned PRC subsidiary of Fushi." The loan was "noninterest bearing and was due on demand." "Mr. Fu advanced to Fushi another $8 million in October 2010 for the same reason." In October 2010, Fushi "repaid all of the borrowings from [Fu] in equivalent RMB at the exchange rate prevailing in the PRC." In July 2009, "Fushi borrowed a loan from [Fu] in the amount of $12.2 million in order to repay a portion of the HY Notes and the Convertible Notes." The loan was "non-interest bearing and due on demand." Fushi "repaid the total amount to [Fu] in equivalent RMB at the exchange rate prevailing in the PRC in the fourth quarter of 2009."

139. These loans to Fushi gave Fu a strong motive to hide the Company's true financial condition and continue the fraudulent scheme. If the truth was revealed, that the Company was not nearly as successful as Fushi claimed, Fu risked not being paid back "on demand" – or at all.

(Docket Entry No. 57, Amended Complaint at ¶¶ 136-139) (emphasis in original).

For his July 10, 2008 loan from J.P. Morgan in the amount of $5 million, Fu secured this loan with two million shares of Fushi common stock. (Docket Entry No. 66-6 at 5). At that time, Fushi's stock price closed at $20.02 per share. Id., 66-7 at 20, the Bloomberg Report of Fushi's Historical Stock Prices. When Fu sold his shares between October 22, 2008 and November 3, 2008, Fushi's shares sold from $3.99 and $4.87 per share. Id., 66-8. In his Schedule 13D/A, Fu explained that his sale of 1,099,835 shares of Fushi stock was to satisfy a margin call and to repay the J. P. Morgan loan of July 10, 2008. Id., 66-6.

Plaintiffs characterize Fu's sales of his shares between October 22, 2008 and November 3, 2008 as "insider trading proceeds." (Docket Entry No. 57, Amended Complaint at ¶ 137). Plaintiffs allege that Defendant Fu had a motive to hide Fushi's financial condition and to continue the alleged fraudulent scheme because Fu had granted several loans to Fushi that carried

the risk that they would not be paid back if the Fushi stock were unsuccessful. Id. at ¶ 139. These loans Fu allegedly granted were "non-interest bearing" and "due on demand" in July 2009 and September and October 2010 totaling over $35 million of his own money. Id. at ¶ 138.

Plaintiffs also cite Defendant Fu 's undisclosed interest in Dalian Jinchuan and Hongtai entities that Fushi acquired as "bargain purchases"and Fu's financial gain from Fushi's acquisition of those entities. Id. at ¶ 140. A former high level executive identified Fu's ownership interest in Dalian Jinchaun as well as in a second company, the description the former Fushi officials were unable to give, other than as of comparable size to  Hongtai's business. Id.

On November 3, 2010, Fu presented Fushi's board of directors with a proposal, a preliminary, non-binding offer, to purchase Fushi's outstanding shares at $11.50 per share. (Docket Entry No. 66-13 at 2). The announcement of Fu's offer generated  eleven (11) legal actions[4] with claims that Fushi was worth substantially more than Fu's offer. (Docket Entry No. 69, Defendants' Memorandum in Support of Motion to Dismiss at 8-9). According to public reports from Reuters, Fushi's board  appointed an independent special committee to evaluate Fu's proposal to purchase Fushi's share for $9.25 per share. Id. at 9. Plaintiffs allege that Defendant Fu's actual incentive was to inflate the price of Fushi's stock, the value of Fu's stock holdings and Fu's net worth. (Docket Entry No. 57, Amended Complaint at ¶ 135). Fu owned over 40% of Fushi, between 11 and 12 million of the outstanding shares of Fushi as of March 2008.

### b. Other Individuals

---

[4] Defendants note that one of lead Plaintiffs' law firms filed a complaint with such claims and after their motion to be lead plaintiff was denied. This action was filed. (Docket Entry No. 69, Defendants' Memorandum in Support of Motion to Dismiss at 8-9).

Plaintiffs assert that Fushi's executive compensation system motivated the Defendants to engage in these alleged frauds. Id. at ¶ 147. Plaintiffs cite Defendants' compensation as tied significantly to incentives: "Elements of executive compensation presently consist of base salaries, an annual cash incentive plan and equity compensation, such as stock options, in order to achieve a balance between cash and other compensation." Id. According to the Plaintiffs, during the Class Period, Defendants Fu, Longever, Wang, and Studwell received incentive compensation under the Performance Based Cash Incentive Plan. Id. at ¶ 148. Plaintiffs allege that Defendants were eligible for and received both "massive" payouts under Fushi's executive compensation policy as well as stock awards and option awards. Id. at ¶ 149. In addition, Defendants Fu, Longever, and Wang allegedly received a bonus award totaling 100% of their salaries in 2010. Id. Plaintiffs provide the following chart, demonstrating the Defendants' pay-outs during the Class Period:

| Defendant | Year | Salary | Bonus | Stock Awards | Option Awards |
|---|---|---|---|---|---|
| Fu | 2010 | $240,000 | $240,000 | – | – |
| | 2009 | $240,000 | $50,000 | – | $113,000 |
| | 2008 | $240,000 | $48,000 | – | $318,000 |
| Longever | 2010 | $225,000 | $225,000 | – | – |
| | 2009 | $79,000 | $30,000 | $404,000 | $856,000 |
| | 2008 | – | – | – | – |
| Wang | 2010 | $200,000 | $200,000 | $172,000 | $86,000 |
| | 2009 | $200,000 | $64,000 | – | $93,000 |
| | 2008 | $188,000 | $40,000 | – | $127,000 |
| Studwell | 2010 | $38,000 | $41,000 | $288,000 | $737,000 |
| | 2009 | – | – | – | – |
| | 2008 | – | – | – | – |

Id. at ¶ 150.

Plaintiffs assert that these policies created an incentive for fraud by allowing executives to receive massive bonuses based on achieving Fushi's performance targets without any consequence to the executives, if the financial results were later determined to be false. Id. at ¶ 151. Plaintiffs

assert that Fushi's system lacked any mechanism to recoup improvidently paid bonuses that provided a strong motivation for fraud and supports a strong inference of scienter. Id. at ¶ 152.

## 4. LOSS CAUSATION

Plaintiffs allege, as discussed above, that Defendants' false and misleading statements artificially inflated the prices of Fushi securities and misrepresented Fushi's actual business and financial prospects. Id. at ¶ 153. Plaintiffs allege that as a result of the discovery of these misrepresentations and fraudulent conduct, the price of Fushi securities dropped precipitously, resulting in economic losses to Plaintiffs. Id. Plaintiffs assert that the alleged misrepresentations and omissions directly or proximately caused or were a substantially contributing cause to the damages sustained by Plaintiffs and members of the class. Id. at ¶ 154. Plaintiffs assert that these Fushi's misstatements created a market of unrealistically positive assessment of Fushi and its potential value, causing the Fushi's stock to be overvalued and artificially inflated during the Class Period. Id.

Fushi's disclosures of its actual financial condition caused its stock price to drop and Plaintiffs cite this drop as evincing Fushi's prior statements over the class period to be false. Id. at ¶¶ 155,157-58. Plaintiffs assert that the timing and magnitude to Fushi's stock price decline negates inferences that the loss was a result of changed market conditions or other causes. Id. at ¶ 159. Rather, Plaintiffs assert the losses suffered by the class members were the direct result of the Defendants' fraudulent scheme to inflate artificially the value of Fushi stock. Id.

## 5. Fraud on the Market

Plaintiffs also assert a presumption of reliance established by the fraud-on-the-market doctrine, contending:

40

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) Defendants' omissions and misrepresentations were material;

(c) Fushi's stock traded in an efficient market;

(d) Defendants' misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Fushi's stock; and

(e) Plaintiff and other class members purchased Fushi stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

Id. at ¶ 162.

Plaintiffs assert that the market for Fushi stock was efficient at all relevant times because:

(a) since September 2006, Fushi's stock has been listed and actively traded on the Nasdaq National Market, a highly efficient and automated market;

(b) as a regulated issuer, Fushi filed periodic public reports with the SEC; and

(c) Fushi regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

Id. at ¶ 163.

## B. CONCLUSIONS OF LAW

For a Rule 12(b)(6) motion to dismiss, the Court must assess whether the complaint's factual allegations "raise a right to relief above the speculative level," that is, the claims must be "plausible". Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-556 (2007). "[T]he allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) and the Court must "treat all of the well-pleaded allegations of the complaint as true." Miree v. Dekalb

Cnty., Ga., 433 U.S. 25, 27 n.2 (1977). Yet, a legally sufficient complaint, "require[s] more than the bare assertion of legal conclusions[,]" Columbia Natural Res., Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995), and the district court "need not accept as true legal conclusions or unwarranted factual inferences." Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987).

Moreover, where, as here, fraud is alleged, Fed. R. Civ. P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In a securities action, the heightened pleading standards are to be evaluated as set forth by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007):

> Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.
>
> We establish the following prescriptions: **First**, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts **must**, as with any motion to dismiss for failure to plead a claim on which relief can **be granted**, accept all factual allegations in the complaint as true. **Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.** The inquiry, as several Courts of Appeals have recognized, is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. **Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.**
>
> * * *
>
> **The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.** The inference that the defendant acted with scienter need not be irrefutable, i.e. of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]" . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and

at least as compelling as any opposing inference one could draw from the facts alleged.

\* \* \*

[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint. . . . [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

\* \* \*

We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.

Id. at 322-28 (citations omitted) (emphasis added).

The Sixth Circuit recently restated the Supreme Court's precedent on a Rule 12(b) motion

in a securities action as follows:

Although the PSLRA left the term undefined, the Supreme Court has concluded that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter. Tellabs, 127 S.Ct. at 2509. In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." Helwig v. Vencor, Inc., 251 F.3d 540, 547 (6th Cir. 2001).

In Tellabs, the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under Section 10(b). First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, 127 S.Ct. at 2509. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. (citation omitted). At the second stage, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter

43

**rationally could be drawn.”** Id. **at 2510. Rather, the inference of scienter “must be cogent and compelling, thus strong in light of other explanations.”** Id.

**Finally, in determining whether the pleaded facts give rise to a strong inference of scienter, “the court must take into account plausible opposing inferences.”** Id. **at 2509. Because the strength of an inference “cannot be decided in a vacuum,” the district court must conduct a “comparative inquiry” and assess the possible competing inferences that could be drawn from the allegations, including “plausible nonculpable explanations** for the defendant's conduct, as well as inferences favoring the plaintiff.” Id. at 2509-10.

In defining how this framework is to be applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as “a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.” Id. at 2510 (emphasis added). Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward. See id. at 2510 n. 5; ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008) (“In other words, where there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff.”).

Frank v. Dana Corp., 547 F.3d 564, 570-71 (6th Cir. 2008) (“Dana I”). As the Sixth Circuit stated

recently:

In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach. Cf. Konkol, 590 F.3d at 397–404; Ley v. Visteon Corp., 543 F.3d 801, 809–14 (6th Cir.2008); PR Diamonds, Inc., 364 F.3d at 684. However, we decline to follow that approach in light of the Supreme Court's recent decision in Matrixx Initiatives, Inc. v. Siracusano, ——U.S. ——, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). There, the Court provided for us a post- Tellabs example of how to consider scienter pleadings “holistically” in section 10(b) cases. Id. at 1323–25 (quoting Tellabs, 551 U.S. at 326, 127 S.Ct. 2499) (internal quotation marks omitted). Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis. Id. at 1324–25. This is the only appropriate approach following Tellabs's mandate to review scienter pleadings based on the collective view of the facts, not the facts individually. Tellabs, 551 U.S. at 322–23, 127 S.Ct. 2499 (“The inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.”). **Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after Tellabs,**

44

> **conducting an individual review of myriad allegations is an unnecessary inefficiency. Consequently, we will address the Plaintiffs' claims holistically.**

<u>Dana II</u>, 646 F.3d at 961 (emphasis added).

In addition, the Sixth Circuit ruled that the provisions of Fed. R. Civ. P. 8 and the requirement of Rule 9(b) are to be read in conjunction with each other. <u>Michaels Bldg. Co. v. Ameritrust Co., N.A.</u>, 848 F.2d 674, 679 (6th Cir. 1988). In <u>Blount Financial Services v. Walter E. Heller & Co.</u>, 819 F.2d 151 (6th Cir. 1987), the Court explained that "Rule 9(b) requiring 'averments of fraud . . . with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." <u>Id.</u> at 153 (citation omitted). Rule 9(b) is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." <u>Am. Town Ctr. v. Hall 83 Assocs.</u>, 912 F.2d 104, 109 (6th Cir. 1990) (citing <u>Michaels Bldg. Co.</u>, 848 F.2d at 679).

Under <u>Michaels Building Co. v. Ameritrust Co.</u>, 848 F.2d 674 (6th Cir. 1988), the plaintiff can satisfy Rule 9(b)'s requirements by pleading the circumstances of the fraud, not the evidence. <u>Id.</u> at 680 n.9. Since <u>Ameritrust</u>, however, the Sixth Circuit reiterated the rule of this Circuit that Fed. R. Civ. P. 9(b) requires that fraud be pled with particularity. To satisfy Fed. R. Civ. P. 9(b), a plaintiff must "at a minimum **'allege the time, place and contents of the misrepresentation[s] upon which [the plaintiff] relied.'**" <u>Am. Town Ctr.</u>, 912 F.2d at 109 (quoting <u>Bender v. Southland Corp.</u>, 749 F.2d 1205, 1216 (6th Cir. 1948)) (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient

under Rule 9(b). In <u>Benoay v. Decker</u>, 517 F.Supp. 490 (E.D. Mich 1981) (<u>aff'd</u> 735 F.2d 1363 (6th Cir. 1984)), the district court stated:

> The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt to distinguish among them.
>
> This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'

<u>Id.</u> at 493 (quoting <u>McFarland v. Memorex Corp.</u>, 493 F. Supp. 631, 639 (N.D. Cal. 1980), (quoting <u>Jacobson v. Peat, Marwick, Mitchell & Co.</u>, 445 F. Supp. 518 (S. D. N. Y. 1977))).[5]

More recently in <u>City of Monroe Employees Retirement Sys. v. Bridgestone Corp.</u>, 399 F.3d 651 (6th Cir. 2005), the Sixth Circuit noted a split in precedents, including a decision of a district court in this Circuit, on the "group pleading" exception to Rule 9(b). <u>Id.</u> at 689-90 n.32. This exception applies "in cases of corporate fraud where the false and misleading information is conveyed in a prospectuses, registration statements, annual reports, press releases, or 'other group published information,' [where] it is reasonable to presume that these are the collective actions of officers." <u>Id.</u> at 689-90 nn. 32 & 33 (citing *inter alia*, <u>In re SmarTalk Teleshares, Inc. Sec. Litig.</u>, 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000)). <u>Bridgestone</u>, however, did not adopt this exception and expressly declined to do so. 399 F.3d at 690. In any event, the Sixth Circuit followed <u>Benoay</u> on this specific pleading rule in <u>United States ex rel. Bledsoe v. Community Health Sys, Inc.</u>, 342 F.3d 634 (6th Cir 2003). Despite the group pleading exception's relevance, this Court is bound by

---

[5] The Supreme Court cited <u>Benoay</u> approvingly albeit on other grounds. <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 170 (1994).

existing Sixth Circuit precedents in <u>Bledsoe</u> and <u>Benoay</u> that a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations.

As stated in <u>Tellabs</u>, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. at 322. In <u>Weiner v. Klais & Co., Inc.</u>, 108 F.3d 86 (6th Cir. 1997), the Sixth Circuit reiterated the general rule that: "Matters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." <u>Id.</u> at 88 (citations omitted). Yet, the <u>Weiner</u> Court recognized an exception in securities cases, but only for papers filed by a defendant and referred to a plaintiff's complaint.[6]

> [T]he [district] court held . . . it would consider 'only those exhibits submitted by the defendant which can properly be considered incorporated by reference into the complaint and, thus, a part of the pleadings.'
>
> **Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.** Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has held that **"[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." We believe that this approach is appropriate.**

---

[6]This principle does not extend to extrinsic evidence. <u>Katt v. Titan Acquisitions, Ltd.</u>, 133 F. Supp. 2d 632, 637-38 (M.D. Tenn. 2000). The court cannot presume the truth of the extrinsic information nor use such information in evaluating the pleadings. <u>Bridgestone</u>, 399 F.3d at 665; <u>see also</u> <u>Logan v. Denny's, Inc.</u>, 259 F.3d 558, 581 n.5 (6th Cir. 2001) (court may not take judicial notice of disputed facts).

Id. at 89 (emphasis added and citations omitted) (quoting Venture Assocs. Corp. v. Zenith Data Sys. Corp, 987 F.2d 429, 431 (7th Cir. 1993); see also Neiman v. NLO, Inc., 108 F.3d 1546, 1555 (6th Cir. 1997).

In Beaver County Retirement Bd. v. LCA-Vision,Inc, No. 1:07cv 750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009), the district court explained that "[c]ourts may take judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements." Id. at *4 (citing In re UnumProvident Corp. Sec. Litig., 396 F. Supp.2d 858, 876 (E.D. Tenn.2005) (citing Philips v. LCI Int'l, Inc., 190 F.3d 609, 617 (4th Cir.1999)). This includes "the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint.'" Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001); see also In re FirstEnergy Corp. Sec. Litig., 316 F. Supp.2d 581, 591 (N. D. Ohio 2001). However, the Court may take judicial notice of these documents only to the extent that their "existence or contents prove facts whose accuracy cannot be reasonably questioned." Passa v. City of Columbus, 123 F. App'x 694, 697 (6th Cir. 2005).

Based upon Sixth Circuit precedent, the Court will consider the SEC filings, but evaluate them in light of the allegations in the amended complaint. The Court will also consider, with exceptions, those documents referred to in Plaintiffs' amended complaint and the SEC and market reports submitted by the Defendants, (Docket Entry No. 66, Attachments thereto, and Docket Entry No. 83, Attachments thereto). The exceptions are the Wall Street Journal article that involves disputed facts. See Monroe Ret. Sys. v. Bridgestone Corp., 389 F.3d 651, 662 n. 10 (6th Cir. 2005). The Court will not take judicial notice of the Muddy Water report nor Plaintiffs' Wall Street Journal articles (Docket Entry No. 77, Attachments thereto and Docket Entry No. 8, Attachments thereto)

because these materials involve disputed facts and their "'existence or contents prove facts whose accuracy' are ' reasonably questioned'" by the parties. <u>LCA-Vision</u>, 2009 WL 806714, at *4 (citing <u>Passa</u>, 123 F. Appx. at 697).

## 1. PLSRA STANDARDS

Plaintiffs' claims seek recovery under §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (2010), prohibits the use "in connection with the purchase or sale of any security . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . .[.]" Pursuant to this section, the Securities Exchange Commission promulgated Rule 10b-5, that provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> * * *
>
> To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b-5.

The Supreme Court described the purpose of the 1934 Act as follows:

> The 1934 Act was designed to protect investors against manipulation of stock prices. See S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the 'fundamental purpose' of the Act as implementing a philosophy of full disclosure."

<u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 230 (1988) (quoting <u>Santa Fe Industries, Inc. v. Green</u>, 430 U. S. 462, 477-78 (1977) (quoting <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U. S. 180, 186 (1963))).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78a et seq. (2010), that requires specificity in pleadings in private securities litigation before commencement of discovery:

> (b) Requirements for securities fraud action. (1) Misleading statements and omissions. In any private action arising under this chapter in which the plaintiff alleges that the defendant - -
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind. (A) [I]n any private action arising under this chapter, the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
>
> * * *
>
> (3) Motion to dismiss, stay of discovery. (A) Dismissal for failure to meet pleading requirements. In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.
>
> (B) Stay of discovery. In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. §78u-4(b)(1)(A), (b)(2)(A) & (3)(A)-(B) (2010) (emphasis added).

The purpose of the PSLRA was to "protect investors, issuers, and all who are associated with our capital markets from abusive securities litigation" as well as to "implement[] needed procedural protections to discourage frivolous litigation." H.R. Rep. No. 104-369 at 32 (1995) (Conf. Rep.).

Although Congress added the necessity of "strong inference," the Sixth Circuit later clarified that the PSLRA did not alter the recklessness standard for scienter in federal securities actions. In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999).

## 2. PLAINTIFFS' SECTION 10B-5 CLAIMS

In Sante Fe Industries, Inc. v. Green, 430 U.S. 462 (1977), the Supreme Court stated that Section 10 (b) did not encompass "instances of corporate mismanagement." Id. at 477. Rather, "Section 10(b)'s general prohibition of practices deemed by the SEC to be 'manipulative' in this technical sense of artificially affecting market activity in order to mislead investors is fully consistent with the fundamental purpose of the 1934 Act to substitute a philosophy of full disclosure for the philosophy of caveat emptor . . . ." Id. at 476-77 (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (quoting Capital Gains Research Bureau, 375 U.S. at 186)). "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." Sante Fe Indus., 430 U.S. at 477

As to the elements of a Section 10(b) claim, the Sixth Circuit recently restated the elements as follows: "To state a securities fraud claim under Section 10(b), a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" Dana Corp., 547 F.3d at 569 (quoting In re Comshare, Inc., 183 F.3d at 548).

Plaintiffs assert multiple theories of liability for their Section 10(b) and Rule 10(b)(5) claims, namely: (1) that Defendants made misrepresentations or misleading statements about Fushi's actual financial condition and its profitability; (2) that the Defendants' treatment of the SWAP and bargain acquisitions failed to comply with GAAP and other financial standards causing a misleading

overstatement of Fushi's income and profitability; (3) Fushi's compensation structure provided the individual Defendants the motive and opportunity for these misrepresentations; (4) that the Defendants' misstatements and practices caused material losses in the value of Fushi's stock; (5) the Defendants' concealment of Fushi's actual practices effected a fraud on the market; (6) that public disclosures of some facts do not bar Plaintiffs' claims; (7) that the Defendants did not disclose Defendant Fu's ownership of substantial amounts of Dalian Jinchuan stock; and (8) that liability of the individual Defendants' control is not subject to the heightened level of pleading.

The core of the Defendants' motion focuses on the sufficiency of Plaintiffs' allegations on the elements of materiality, scienter, loss causation and individual liability that involve overlapping factual allegations. In sum, Defendants contend that under relevant precedents, Plaintiffs' allegations are not actionable because: (1) Plaintiffs fail to allege any facts to suggest the lack of good faith or recklessness or wilfulness given Defendants' public disclosures and reliance on an outside auditor for its financial reports and accounting on the SWAP and "bargain acquisitions;" (2) at the time of the SWAP, it was factually impossible to know the SWAP's effect on Fushi's income; (3) Fushi's restatements of its financial condition are not material nor evince a strong inference of scienter; (4) Plaintiffs's allegations of the Defendants' alleged knowledge and/or recklessness are conclusory; (5) Plaintiffs' allegations are also insufficient to meet the recklessness standard to impose liability based upon the Sox certifications; (6) Plaintiffs' allegations about a former unidentified executive are insufficient for the requisite scienter; and (7) that neither the secured insider loans nor stock tradings nor executive compensation is actionable.

Applying the holistic method of assessment of <u>Tellabs</u>, the Court reviews of Plaintiffs' specific allegations on each element of their securities claims, their theories of liability and the

alleged role of each individual defendant in Fushi's alleged misstatements, omissions and /or conduct concerning Fushi's actual financial condition and practices.

### a. Defendants' Misrepresentation and Omissions

Here, Plaintiffs allege that Fushi's misrepresentations and omissions are based upon Fushi's SEC reports and Defendants' statements to investors and analysts during conferences about whether its SWAP qualified for the accounting treatment and whether the Dalian Jichuan and Hongtai acquisitions qualified as "bargain purchase" acquisitions for favorable accounting treatment. These written and oral statements benefitted Fushi by attracting investors. The alleged falsity of these statements to investors is reflected in the Defendants' subsequent announcements that none of these transactions qualified under the GAAP standards for the specialized treatment that favorably impacted Fushi's financial condition. In addition, Plaintiffs allege that Fushi's SEC reports, statements on conference calls and press statements about its financial conditions were materially misleading about Fushi's GAAP compliance and actual internal controls over Fushi's finances and Fushi's actual financial condition during the Class Period. (Docket Entry No. 57, Amended Complaint at ¶¶ 75, 88, 104, 116).

Plaintiffs also cite Defendant Longever's statements attributing the disappointment in Fushi's financial performance to Fushi's customers' decisions in not "restocking" their inventories and maintaining those inventories "at only a minimal levels." Id. at ¶ 126). Plaintiffs cite two former Fushi employees who state "Fushi's customers did not keep inventory on hand or have warehouses for inventory." Id. at ¶ 128. The Defendants also failed to disclose Fu's ownership interests in the bargain purchases acquisitions. Id. at ¶ ¶ 54, 140-41.

Plaintiffs' first set of claims evolves around the Defendants' initial statements about Fushi's SWAP, the SWAP's positive effect on Fushi's net income and the Defendants' subsequent disclosures about the SWAP and impropriety of the adverse effects on Fushi's financial condition. Courts describe a SWAP as a category of market agreements on cash flow that firms employ in the marketplace to adjust to variable interests and changes in the values of currency:

> A swap is an agreement between two parties ("counterparties") to exchange cash flows over a period of time. Generally, the purpose of an interest rate swap is to protect a party from interest rate fluctuations. The simplest form of swap, a "plain vanilla" interest-rate swap, involves one counterparty paying a fixed rate of interest, while the other counterparty assumes a floating interest rate based on the amount of the principal of the underlying debt. This is called the "notional" amount of the swap, and this amount does not change hands; only the interest payments are exchanged.

> In more complex interest rate swaps, . . . the floating rate may derive its value from any number of different securities, rates or indexes. In each instance, however, the counterparty with the floating rate obligation enters into a transaction whose precise value is unknown and is based upon activities in the market over which the counterparty has no control. How the swap plays out depends on how market factors change.

Proctor & Gamble Co. v. Bankers Trust Co., 925 F. Supp. 1270, 1275 (S.D. Ohio 1996).

In Proctor & Gamble, the district court noted the varying views about the SWAPs as a financial instrument:

> One leading commentator describes two 'visions' of the 'explosive growth of the derivatives market.' Hu, *Hedging Expectations: "Derivative Reality" and the Law and Finance of the Corporate Objective,* Vol. 73 Texas L.Rev. 985 (1995). One vision, that relied upon by derivatives dealers, is that of perfect hedges found in formal gardens. **This vision portrays the order—the respite from an otherwise chaotic universe—made possible by financial science. Corporations are subject to volatile financial and commodities markets.** Derivatives, by offering hedges against almost any kind of price risk, allow corporations to operate in a more ordered world.

> The other vision is that of "science run amok, a financial Jurassic Park." Id. at 989. Using this metaphor, Hu states:

In the face of relentless competition and capital market disintermediation, banks in search of profits have hired financial scientists to develop new financial products. Often operating in an international wholesale market open only to major corporate and sovereign entities—a loosely regulated paradise hidden from public view—these scientists push the frontier, relying on powerful computers and an array of esoteric models laden with incomprehensible Greek letters. But danger lurks. **As financial creatures are invented, introduced, and then evolve and mutate, exotic risks and uncertainties arise. In its most fevered imagining, not only do the trillions of mutant creatures destroy their creators in the wholesale market, but they escape and wreak havoc in the retail market and in economies worldwide.** Id. at 989–90.

Given the potential for a "financial Jurassic Park," the size of the derivatives market and the complexity of these financial instruments, it is not surprising that there is a demand for regulation and legislation.

Id. at 1275-76 (emphasis added and footnote omitted).

As to the financial effect of a SWAP agreement that involve interest rates, in <u>Yountville Investors, LLC. v. Bank of America, N.A.</u>, No. C08-425RSM, 2009 WL 2342462 (W.D. Wash. July 28, 2009), the Court observed:

> **Interest rate swap agreements provide a powerful tool for altering the character of assets and liabilities,** fine tuning risk exposure, lowering the cost of financing or speculating on interest rate fluctuations. **Borrowers can rely on interest rate swaps to reduce exposure to adverse changes in interest rates or to obtain financing characteristics unavailable through conventional lending. Interest rate swaps can modify a borrower's all-in funding costs from fixed-to-floating, floating-to-fixed or a combination of both.** Interest rate swaps have become an important part of international and domestic commerce, and the market for these instruments has experienced explosive growth.

Id. at * 2 (quoting <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 142–43 (9th Cir. 2003) (emphasis added)). In 2010, the Dodd-Frank Act amended the definition of a security to include SWAPs. 15 U.S.C. § 78c.

Here, Plaintiffs allege that Fushi's SWAP was a "plain vanilla" SWAP that according to Plaintiffs, is not complicated under GAAP standards. Plaintiffs allege that Fushi's SWAP, in fact, did not qualify for the accounting treatment as stated in Fushi's SEC form. Defendants admitted this

noncompliance in Fushi's SEC filings. The disqualification of the SWAP allegedly arose from the fact that Fushi's long term debt never faced any risk with variations in interest rates. This lack of qualifications is reflected in the Defendants' 2011 disclosures about the SWAP. Thus, Fushi's SWAP lacked any apparent purpose other than the effect of significantly increasing Fushi's income and attractiveness to investors. The significant rise in Fushi's net income after the SWAP (24% in the first quarter) could reasonably attract investors. Plaintiffs allege that with the Defendants' stated noncompliance with simple accounting standards for a "plain vanilla" SWAP, the Defendants either knew or recklessly disregarded the SWAP's allegedly clear ineligibility. Defendants respond that because the SWAP was disclosed to investors, such disclosure precludes any suggestion of scienter.

As to the Fushi acquisitions, the Defendants initially gave the "bargain purchase" accounting treatment to the value of those acquisitions. This "bargain purchase" accounting caused Fushi to realize a total of $5.1 million in the first and second quarters of 2010. (Docket Entry No. 57, Amended Complaint at ¶ 31). Plaintiffs allege that Fushi failed to meet its projected financial goal in the first quarter of 2011, after the 2010 acquisitions by 39 %. Id. at ¶ 127. The Court concludes that these facts alone reflect material misstatements and omissions about Fushi's actual financial condition. Defendants also contend that Fushi's restatement, when viewed over the four years of the restatements, the 4% decrease in Fushi's net income bars actionability.

To accept the Defendants' contention on the SWAP disclosure would effectively eviscerate the 2010 amendments to Dodd-Frank to include SWAP as a security. Given the complex and manipulative nature of a SWAP, a reasonable investor may reasonably be unable to appreciate the significance and appropriateness of a particular SWAP. The reasonable investor is entitled to rely upon the Defendants' representations about the appropriateness of the SWAP. Given the

56

Defendants' admitted misrepresentation of the purpose of its SWAP that can be manipulated, the Court concludes that Plaintiffs' allegations about the Defendants' SWAP present reasonable inferences of scienter.

As to the cumulative effect of the SWAP and acquisitions accounting improprieties, given that the Defendants are required to file SEC reports on a quarterly basis and conduct quarterly conferences with investors who purchase or advise clients to purchase Fushi stock, the Court concludes that any analysis based upon four years is unjustified. Moreover, viewed cumulatively, Plaintiffs cite a Jeffries analyst's statements that "we do consider [the Defendants' restatements] material to earnings, as they all exceed 8%." Id. at ¶ 123.

With Plaintiffs' factual allegations about Fushi's SWAP, coupled with the bargain purchase acquisitions that were also improperly classified for accounting purposes and caused the restatement of Fushi's income for four years as well as a material drop in the value of Fushi stock price, the Court concludes that Plaintiffs plausibly allege actionable misstatements and omissions about Fushi's actual finances and related business practices.

As to the Sarbanes-Oxley certifications, courts have declined to treat corporate officers' signatures for such certifications, as a per se violation, where, as here, accounting errors or mistakes are revealed by a subsequent audit. Ley v. Visteon Corp., 543 F.3d 801, 812 (6th Cir. 2008) ("We agree with the Eleventh Circuit that a 'Sarbanes-Oxley certification is only probative if the person signing the certification was severely reckless in certifying the accuracy of the financial statements'") (citation omitted). In Garfield v. NDC Health Corp., 466 F.3d 1255 (11th Cir. 2006), the Eleventh Circuit stated "If we were to accept [Plaintiffs'] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made

by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." Id. at 1266. Yet, Section 10(b)(5) claims are stated where, the Defendants' false statements about a corporation's financial condition when the corporate controls were known to be inadequate. Dana II, 646 F.3d at 961 (Defendants "ask us to infer that failed accounting systems are to blame here, and we find that inference plausible. However, the inference that [the Defendants] recklessly ignored the falsity of their external statement is at least as plausible as faulty accounting."); see also In re PhyCor Corp. Sec. Litig., No. 3:98-0834, slip op. at 6 (M.D. Tenn. Feb. 17, 2000).

Here, the Sox certifications expressly reflect the signatories' assurances to investors of adequate internal controls of Fushi's finances, including accounting and GAAP compliance. The Individual defendants certified to investors, inter alia that they had "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles . . . ." (Docket Entry No. 57, Amended Complaint at ¶ 64). Plaintiffs allege clear accounting errors on the SWAP and "bargain purchase acquisitions." Such clear accounting violations give rise to a plausible inference of the lack of internal review of these transaction as well as the lack of any accounting controls.

To be sure, Defendants contend that many of the statements cited by Plaintiffs in Defendants' reports and conferences were forward looking statements that the PSLRA precludes as bases for a securities claims, citing 15 U.S.C. § 78u-5(c)(1), related to or stated to be dependent on those historic or present tense statements when made.

58

Plaintiffs assert that Fushi's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period are ineffective to shield those statements from liability. Id. at ¶ 160. Plaintiffs assert that Defendants are liable for any false or misleading FLS because the speakers allegedly knew at the time that these forward looking statements were false or misleading when made and such statements were authorized by Fushi executives who knew their content to be false. Id. at ¶ 161. Plaintiffs allege that none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly. Id.

On the issue of whether Plaintiffs' allegations present hard or soft information, under Sixth Circuit precedents, "[h]ard information 'is typically historical information or other factual information that is objectively verifiable.' Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable." In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997) (quoting Garcia v. Cordova, 930 F.2d 826, 830 (10th Cir. 1991)); accord Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008). "The failure to disclose soft information is actionable only if it is virtually as certain as hard information." Bridgestone, 399 F.3d at 669 (quotation omitted). As examples, the Sixth Circuit defines "generalized statements of optimism that are not capable of objective verification" as "puffing" statements. In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004). In Ford, the Sixth Circuit held that Ford's statements related to "quality" of its vehicles were not actionable

as mere puffing. Id. As another example, in Bridgestone, the defendant's statement that its tires were "the best tires in the world" was held not to be actionable as a matter of law:

> These statements, both on their own terms and in context, lacked a standard against which a reasonable investor could expect them to be pegged; such statements describing a product in terms of "quality" or "best" or benefitting from "aggressive marketing" are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.

399 F.3d at 671.

Here, the Defendants' statements about the SWAP's and bargain acquisitions eligibility for favorable accounting treatment and Defendants' adequate internal controls on its finances, involve hard information that is objectively verifiable, as reflected by the KGMB audit. Thus, the Court concludes that the Safe Harbor provisions of the PSLRA do not apply here.

### b. Materiality

Plaintiffs allege Fushi's alleged misrepresentations and omissions were material because of favorable effects of the SWAP and "bargain purchase acquisitions" upon Fushi's actual financial conditions in the last three quarters of 2007, the years of 2008 and 2009, and the first three quarters of 2010. (Docket Entry No. 57, Amended Complaint at ¶ 60). The initial effects of the Fushi SWAP increased Fushi's net income by 24% in 2007 and the "bargain purchase" acquisitions had a demonstrable and positive initial impact on Fushi's financial condition and on Fushi's attractiveness to investors. Id. at ¶ 4. Moreover, viewed cumulatively, Plaintiffs cite a Jeffries analyst's statements that "we do consider [the Defendants' restatements] material to earnings, as they all exceed 8%." Id. at ¶ 123.

Section 10(b) and Rule 10b-5 Section 10(b) extend to prohibit material misrepresentations and/or omissions where there is "[the commission] of a manipulative or deceptive act in connection

with the purchase or sale of securities." Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 164 (1994). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). In Basic, the Supreme Court referred to information "such as earnings forecasts or projections" as "contingent or speculative information." Id. at 232 n.9. The Supreme Court, however, did not decide that issue. Id.

In Bridgestone, the Sixth Circuit noted that at the motion to dismiss stage, omissions should be considered material unless the omitted information was so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." Bridgestone, 399 F.3d at 681 (quotation omitted); see also Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)); Arber v. Essex Wire Corp., 490 F.2d 414, 418 (6th Cir. 1974) (The test for materiality is "whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question."). The materiality requirement does not require that the defendant communicated the misrepresentation directly to the plaintiff. In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398,407 (S. D. N.Y. 1998). Unless written misrepresentations are material, such misrepresentations are not actionable. Radol v. Thomas, 772 F.2d 244, 252 (6th Cir.1985). In any event,"the district court should decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question" In re Envoy Corp Sec. Litig., 133 F. Supp. 2d 647, 662 (M.D. Tenn. 2001) (quoting Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000)).

Defendants' principal contention on lack of materiality is that when viewed in the context of the four year period of the restatements, the actual effect of Fushi's restatement (4% loss of net income) fails to meet the standard of materiality for a securities claim. (Docket Entry No. 69, Defendants' Memorandum at 23, 27) (citing inter alia In re SCB Comp. Tech Sec. Litig., 149 F. Supp.2d 334, 359 (W.D. Tenn. 2001) and In re The Goodyear Tire & Rubber Co. Securities Litig., 436 F. Supp.2d 873, 894 (N.D. Ohio 2006)). Defendants also assert that the bargain purchase acquisitions in 2010 caused only a 1% overstatement of Fushi's income in 2010. (Docket Entry No. 82, Defendants' Reply Memorandum at 17) (citing Konkol v. Diebold Inc., 590 F.3d 390, 400 (6th Cir. 2009) (requiring "the amount of improperly recognized revenue . . . to be significant")). Defendants rely on Konkol to argue that their overstatement is not "significant [enough] . . . to support a finding of scienter." Defendants assert that Plaintiffs' allegations about the overstatement of Fushi's income did not result from a scheme "from which scienter can be strongly inferred by the magnitude of errors alone."

In response, Plaintiffs note that Fushi's employment of the SWAP led to 24% overstatement of its income in 2007. (Docket Entry No. 57, Amended Complaint at ¶ 29). This 24% increase in 2007 would be a material fact to an investor who decided to purchase Fushi stock in 2007 based upon Defendants' statements about Fushi's financial condition in 2007. Plaintiffs cite financial analysts who assessed Fushi's restatement stating that "we do consider [the restatements] material to earnings as they all exceed 8%." Id. at ¶ 123. Plaintiffs also allege that Fushi's audit committee that prepared the restatements deemed the accounting errors "material." Id. at ¶ 10. Plaintiffs cite precedent, Ganino and the authorities cited therein, that a 2% overstatement of income can be actionable. (Docket Entry No. 76, Plaintiffs' Response at 18, citing Ganino, 228 F.3d at 164).

In Ganino, the Second Circuit stated that misstatements of a firm's income involves material facts because "'earnings reports are among the pieces of data that investors find most relevant to their investment decisions' and that the 'materiality is determined in light of the circumstances existing at the time of the alleged misstatement occurred.'" Id. at 165 (quoting In re Burlington Coat Factory, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997). As to Defendants' reliance on Konkol, in light of Matrixx Initiatives and Dana II, the analysis described in Konkol is not controlling. Konkol, 590 F.3d at 400. As noted in SCB Comp, courts differ on this issue of the extent of the accounting errors. 149 F. Supp.2d at 359 (collecting citations). Given that investors purchased stock at different times covering a period of years and given that Defendants' report on these financial sales quarterly, the fall in Fushi's stock prices after the restatement because of the SWAP and Fushi's "bargain purchase" acquisitions, is a relevant on the materiality issue. See In re Omnivision Technologoes, Inc., No. C04-2297SC, 2005 WL 1867717, at *3    (N.D. Cal. July 29, 2005) ("the investing community finds improper revenue recognition incidents to be serious matters regardless of the direction of the improper recognition"). To be sure, some courts hold that where the claim is based solely on the restatement of income, the restatement must be substantial SCB Computer, 149 F. Supp.2d at 359; In re The Goodyear Tire & Rubber Co. Securities Litig., 436 F. Supp.2d at 894. Yet, here the materiality focuses upon the financial appeal of the SWAP and acquisitions to investors during the time period of those transactions.

Under Matrixx Initiatives and Dana II, these accountings allegations must be evaluated with the "collective facts" of the case. Given the effect of the SWAP generating  the 24% increase in Fushi's net income, the capacity of a SWAP to enhance falsely a firm's actual financial condition and the added value that the "bargain purchase" acquisitions provided Fushi, the Court concludes

that Defendants' statements about Fushi's SWAP, Fushi's "bargain purchase" acquisitions and related statements and Fushi's restatements, collectively constitute material facts that would influence a reasonable investor. In addition, the Court deems significant on these accounting disqualifications, that after the disqualifications of its SWAP and "bargain purchase" acquisitions, Defendants announced that Fushi would be unable to file timely its 2010 SEC Form 10-K that creates an inference about the seriousness and materiality of the accounting errors. Thus, the Court concludes that Plaintiffs' factual allegations plausibly satisfy the materiality element of the Section 10(b) claims.

### c. Plaintiffs' Scienter Allegations

Plaintiffs' allegations of scienter overlap with their factual allegations on the materiality element, namely: (1) that Fushi's SWAP, increased its income 24% in one quarter that later "increased 50%" for 2007, but Fushi was never exposed to any foreign exchange currency risks on Fushi's high yield notes to justify a SWAP; (2) that Defendants recklessly disregarded the fact that with the SWAP, the Renminbi/United States exchange rate could not off set the London Interbank Offered Rate; (3) that the Defendants' failed to disclose Fu's interest in the bargain purchases; (4) that Defendants failed to disclose Fu's ownership interest in Dalian Jinchuan and Hongtai acquisitions; (5) that Defendants did not in fact have any internal controls over its finances as reflected by Defendant Fu's alleged total control; (6) that former Fushi executives expressed fears of going to jail for Fushi's accounting practices; and (7) that based upon statements of former Fushi executives, Longever made false statements about Fushi's the customers inventory practices as the cause of Fushi's drop in profitability. (Docket Entry No. 57, Amended Complaint at ¶¶ 37-47, 54, 72 & 140-41).

Defendants' principal challenges to these allegations as bases for a strong inference of scienter are, in sum: (1) that as a matter of law, accounting errors do not give rise to strong inferences of scienter; (2) Fushi's public disclosures in its SEC filings about the SWAP transactions; (3) that the Defendants relied upon independent auditors for the accounting appraisals of its SWAP and its "bargain purchase" acquisitions of Dalian Jinchuan and Hongtai ; (4) that the effect of the disqualifications of the SWAP and bargain purchase acquisitions caused a restatement resulting in a total 4% reduction in Fushi's income over the four year period of the restatement; (5) that there is no tie between Fu's 2008 stock sale and 2009 interest free loan to Fushi and the 2007 SWAP transaction or the 2010 "bargain purchase" acquisitions; (6) that there is no tie between the 2010 bonuses to any questionable transaction; (7) that hearsay and conclusory statements of former executives are inadequate for any strong inference of scienter; (8) that Fushi's termination of its auditors after announcement of the accounting disqualifications does not evince scienter; (9) that the Defendants' March 11, 2011statement is a forward looking statement that is not actionable; and (10) that Plaintiffs' fail to allege any facts to suggest the lack of good faith in their public statements. (Docket Entry No. 69, Defendants' Memorandum in Support of Motion to Dismiss at 22-32).

If the complaint fails to satisfy the scienter requirement, the Court must dismiss Plaintiffs' complaint upon a motion of the defendant. 15 U.S.C. § 78u-4(b)(3). "The Supreme Court has held that 'scienter' is a 'mental state embracing intent to deceive, manipulate or defraud.'" In re Comshare, 183 F.3d at 548. "[U]nder current Sixth Circuit law, 'recklessness [also] satisfies the § 10(b)/Rule10b-5 scienter requirement.'" Id. at 550. Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" Id.

at 550 (quoting <u>Mansbach v. Prescott, Ball, & Tuner</u>, 598 F.2d 1017, 1024 (6th Cir. 1979). To meet the scienter requirement, Plaintiffs' allegations must describe "multiple, obvious red flags." <u>PR Diamonds v. Chandler</u>, 364 F.3d 671, 687, 687; <u>In re Comshare</u>, 183 F.3d at 553.

In the Sixth Circuit, a company's restatements of its finances involving millions of dollars has been rejected as evincing scienter. <u>PR Diamonds</u>, 364 F.3d at 684. In this Circuit, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." <u>In re Comshare</u>, 183 F.3d at 553 (citations omitted). To give rise to an inference of scienter, accounting violations must be of a "type and scope" to be "obvious" or to show the "'magnitude,' 'pervasiveness' and 'repetitiveness' of the company's violations of 'simpl[e] accounting principles' . . . amounting to a night-and-day difference." <u>PR Diamonds</u>, 364 F.3d at 684- 85 (quoting <u>In re MicroStrategy, Inc. Sec. Litig.</u>, 115 F. Supp. 2d 620, 635-37 (E.D. Va. 2000). For accounting errors alone to suffice, the Plaintiffs must also allege facts of "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger may not be known, it must at least be so obvious that any reasonable man would have known of it." <u>In re Comshare</u>, 183 F.3d at 550.

For accounting errors, Plaintiffs allegations must state facts "that Defendants knew or could have known of the errors or that regular procedures should have alerted them to the errors sooner than they actually did." <u>Id.</u> at 553. Moreover, in the Sixth Circuit, misleading financial presentations that are intended to confuse rather than illuminate investors, can provide a strong inference of scienter. <u>Bridgestone</u>, 399 F.3d at 684. <u>PR Diamonds</u> cited approvingly of precedent that found a strong inference arising where the company "touted the Individual Defendants' careful monitoring of the very areas in which Intrenet committed accounting violations." 364 F.3d at 688 (citation omitted). Moreover, accounting errors can be "viewed in combination with other allegations." <u>Id.</u>

at 686. Based upon <u>PR Diamond</u> and <u>In re Comshare</u>, the Court concludes that Fushi's restatement alone does not give rise to a strong inference of scienter, but "GAAP violations . . . along with other circumstances, can create a strong inference of scienter." <u>In re Envoy Corp. Sec. Litig.</u>, 133 F. Supp. 2d 647, 660 (M. D. Tenn. 2001). Moreover, disclosure of accounting information understandable only by a person with a high degree of sophistication, if false, may give rise to an inference of scienter. <u>In re Kindred Healthcare Inc. Sec. Litig</u>, 299 F. Supp. 2d 724, 741 (W.D. Ky. 2004).

In any event, as stated earlier, the holistic approach now controls. The Court concludes that under the holistic standard of review Plaintiffs' factual allegations about accounting issues must be assessed with the other factual allegations about the Defendants' statements, conduct and omissions involving the SWAP and bargain acquisitions. The SWAP raised Fushi's income by 24%. The Court notes that in <u>Dana II</u>, the Sixth Circuit found a strong inference of scienter where the defendants allegedly "overstated its net income for the first quarter of 2004 by twelve percent, the second quarter of 2004 by ten percent, the fourth quarter of 2004 by 3.6 percent, the first quarter of 2005 by 12.5 percent and the second quarter of 2005 by seventy percent." 646 F.3d at 960. The Sixth Circuit inferred recklessness from the "failed accounting system" or from the defendants' "recklessly ignor[ing] the falsity of their external statements." <u>Id.</u> at 961.

Here, Plaintiffs' allegations are that from an accounting perspective, Fushi's SWAP was "plain vanilla." Yet, a SWAP involves a complex accounting transaction that is "'a powerful tool for altering the character of assets and liabilities,'" <u>Yountville Investors</u>, 2009 WL 2342462 at *2 (citation omitted), and can be "a financial Jurassic Park." <u>Proctor & Gamble</u>, 925 F. Supp. at 1276. Thus, a SWAP's terms and implications may not be understood by an ordinary reasonable investor. This fact, coupled with the fact, that Fushi **never** faced any risk of currency rate exchange on its long

term debt, creates an obvious inference of improper use of the SWAP. Assertions that the Defendant

employed an independent accounting firm's assessment on these issues does not confer immunity

nor can such an issue be decided at pleading stage.[7] Otherwise, a defendant's mere disclosure of a

---

[7] See Nicole B. Neuman, A "Sarbanes-Oxley" for Credit Rating Agencies? A Comparison of the Roles Auditors' and Credit Rating Agencies' Conflicts of Interest Played in Recent Financial Crises, 12 U. Pa. J. Bus. L. 921, 929, 930-31 (2010) (footnotes omitted):

> In recent history, America faced another financial crisis that similarly raised doubts about the health and integrity of our financial markets. In the first years of the new millennium, it was uncovered that several mammoth international corporations, such as Enron, Tyco, Adelphia, and WorldCom, employed irregular accounting practices, published deceptive financial statements, and committed outright fraud. After stock prices plummeted and some corporations declared bankruptcy, America experienced "a loss of hundreds and hundreds of billions, indeed trillions of dollars in market value." The damage could be measured objectively in terms of ruined financial portfolios, lost jobs, and failed pensions. But the damage could also be measured more subjectively in terms of the public's lost confidence in financial statements, auditors, and America's financial markets.
>
> . . .
>
> Accounting firms attempted to recapture lost profits by marketing ancillary services to their audit clients. Their efforts were successful: over the next few decades, non-audit services became as bigger moneymakers than audit services. For example, in 2000, more than half of the $52 million in fees that Enron paid Arthur Andersen was for non-audit work. Not surprisingly, auditors came to depend on their cash-cow ancillary services, even though such reliance opened them up to conflicts of interest. As a result, the accounting scandals were almost predictable. Federal laws required publicly held companies such as Enron to be audited by accountants who signed off on audit opinions. These accountants, however, were paid by their audit clients to write the audit opinions. Additionally, the auditors sold to these clients ancillary services which were often more profitable than the audit services themselves. Therefore, auditors had good reason to avoid digging too deep into or revealing bad news about their clients' financial statements because angry or bankrupt audit clients generally do not buy costly ancillary services from prying auditors. As a Senate Committee on Governmental Affairs staff member explained, "it is difficult to comprehend how such large consulting fees could not have created a serious conflict of interest for Andersen" and other audit firms.

SWAP and use of an independent audit in a SEC report would confer blanket immunity from the federal securities laws. Moreover, the Defendants represented to investors that Fushi had internal controls for compliance with GAAP standards in their financial transactions. Here, Plaintiffs allege that the Defendants never undertook any effort to verify the cited independent accounting firm's opinion about these transaction. Defendants' later admissions about the clearly improper accounting treatment of SWAP's and bargain purchase acquisitions ineligibility raises an inference of scienter about the Defendants' prior statements on these issues and Fushi's internal controls. These allegations of improper accounting treatment also give rise to an inference of scienter.

Fushi's restatements of these errors precluded timely compliance with an SEC report that gives rise to a strong inference about the serious magnitude of the Defendants' accounting mistreatment of these transactions. The "magnitude of [the] false statements are relevant to the scienter element. Dana II, 646 F.3d at 960 As one court recognized in similar circumstances:

> This was strong medicine. Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls. These circumstances, combined with the announcement of the impending restatement, establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question. . . .

In re Sipex Corp. Sec. Litig., No. C05-00392WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).

Plaintiffs also cite Fu's undisclosed ownership interests in at least one of the acquired entities, Jichuan Dalain, as well as Fu's alleged insider trading and Fu's alleged total control of Fushi's finances. A related allegation is Fushi's executive compensation system that paid bonuses

of 100% of the individual Defendants' salaries. Plaintiffs allege each of these facts created the motive and opportunity for the Individual Defendants to act with the requisite scienter. In this Circuit "an executive's desire to protect his position within a company or increase his compensation" does not "comprise a motive for fraud," PR Diamonds, 364 F.3d at 690, nor are allegations that Defendants would receive bonuses linked to company performance sufficient for an inference of scienter. In re Kindred Healthcare, 299 F.Supp.2d at 741. Yet, "'self-interested motivation of defendants in the form of saving their salaries'" can support scienter. Bridgestone, 399 F.3d at 687 (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001). "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide an inference of improper motive. Telxon, 133 F. Supp. 2d at 1029. The Court concludes that if regular compensation is commensurate to the executive's service to the company, then Plaintiffs' allegations that the individual Defendants' had the ability to enhance their compensation by 100% of their regular compensation creates an inference of "unusual pressures to perform" Id.[8] In addition, Defendants allegedly engaged in improper practices that allegedly enhanced their compensation.

As to insider trading, "[a] company's decision to reinvest its own stock undermines an inference of scienter because it presumably would make no sense to purchase that stock if defendants knew the prices to be inflated." Morse, 200 F. Supp. 2d at 898 (internal quotation marks omitted).

---

[8]Defendants rely on In re The Goodyear Tire & Rubber Co. Sec. Litig., 436 F.Supp.2d 873 (N.D. Ohio 2006) to argue that there is no motive present here. In the Court's view Goodyear, is factually inapposite because there the district court found that the plaintiffs' allegation "that [Defendant Company] was in danger of defaulting on loan agreements and that the compensation of its business units finance directors was directly tied to the financial performance of these units" was "insufficient to demonstrate a particularized motive to commit fraud." Id. at 989-90. Unlike Goodyear, here there is a 100% enhancement of salary, a material distinction.

Of Plaintiffs' allegations about Fu's alleged insider trading and stock transactions, the Court concludes that the only allegation to give rise to an inference of scienter is Fu's

"preliminary, non-binding offer to purchase the Company's outstanding shares at $11.50 per share." (Docket Entry No. 69, Defendants' Memorandum at 14) (citing Docket Entry No. 66-13 at 2, Nov. 3, 2010 Form 8-K). Plaintiffs argue that this non-binding offer was a manipulative device to increase the price for Fushi stock that was successful. The Court concludes that an inference of scienter is plausible here from the "nonbinding" nature of Fu's offer. A legitimate, <u>non</u>-binding offer by an insider to purchase company stock could be a deceptive method to enhance artificially Fushi's stock value.

Under the collective factual allegations presented by the Plaintiffs, the Court concludes that Plaintiffs have alleged facts giving rise to strong inferences of scienter so as to state actionable claims under Section 10(b).

### d. <u>Dura's</u> Injury Requirement

Defendants next assert Plaintiffs have not suffered any actionable losses because on March 11, 2011, the day of Defendants' announcement of its restatements, a tsunami struck Japan. Financial press reported that Asian stocks were the hit hardest following the natural disaster on March 11 and, for that and other reasons, and Defendants needed an extension of time to file its 2010 Form 10-K. Although Fushi's share price at the close of March 11, 2011 was $9.42 per share. (Docket Entry No. 66-7 at 5, Stock Price Report).On March 14, 2011, the next trade day, Fushi's stock closed at $8.68 per share. <u>Id.</u> According to Defendants, the Dow Jones Industrial Average declined on March 14, but rallied late in the day to close down only 51.24 points. Defendants assert that Fushi's stock price climbed following the release of the Defendants' restatement. As described earlier, Plaintiffs'

allegations and cited market reports are to the contrary. See (Docket Entry No. 57, Amended Complaint).

The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this [chapter] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Fed. R. Civ. P. 8(a)(2) requires that Plaintiff plead "the relevant economic loss." Moreover, Plaintiffs' complaint must provide some basis for a causal connection between plaintiffs' loss and defendants' misconduct. Dura Pharms. v. Broudo, 544 U.S. 336, 347 (2005).

In Dura, the Supreme Court noted that the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff," id., but a plaintiff must allege "a causal connection between the material misrepresentation and the loss." Id. at 342. The plaintiff must allege that the misrepresentations or concealment affected the market or became generally known to the market and thereby caused a company's stock price to decline. See Lenten v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (plaintiffs must allege that the purported misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security"); see also Initial Pub. Offering, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2003) ("[A] failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect. . . . It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.") Yet, general allegations linking drops in stock price to disclosures of financial news are insufficient to establish loss causation. In re Compuware Sec. Litig., 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005).

The Court concludes that Plaintiffs' allegations are sufficient for such causation under Fed. R. Civ. P. 8 and Dura, with the decline of Fushi's stock after Defendants' announcement of the restatements involving the SWAP and bargain acquisition. Moreover, with Plaintiffs' fraud on the market theory, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for Fushi's publicly traded securities. See D.E. & J. LL.P'ship v. Conaway, 133 Fed. Appx. 994, 999, 1001 (6th Cir. 2005); see also Semerenko v. Cendant Corp., 223 F.3d 165, 186-87 (3d Cir. 2000) ("So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery."). Moreover, as the Second Circuit recently held a bounce back of the stock's value after an initial drop does not preclude a Section 10(b) claim. Acticion AG v. China N. E. Petroleum Holdings, Ltd., No. 11-454CV, 2012 WL 3104589 at * 6-7 (2d. Cir. Aug. 1, 2012).

As to the Defendants' contention of alternate causes of Plaintiffs' losses, the Court agrees with the Seventh Circuit that "it is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct." Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997). Defendants' contentions lack merit at the pleading stage.

### 3. PLAINTIFFS' SECTION 20(A) CLAIMS

Section 20(a) of the 1934 Act, 15 U.S.C. § 78t (2010), and Section 15 of the 1933 Act, 15 U.S.C. § 77o (2010), impose legal responsibilities upon the "controlling person" in a publicly traded company for violations of the Securities Act by their agents, subject to certain defenses. Section 15 of the 1933 Act provides as follows:

73

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. Similarly, Section 20(a) of the 1934 Act provides:

a. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action.

15 U.S.C. § 78t (2010).

Under federal securities law, the controlling person must be an actual participant and in control of the specific activity at issue. "[E]ssential elements" for a control person is of "power to control the specific transaction or activity upon which the primary violation is predicated" **and** "actual[] participat[ion] in (i.e., exercise control) the operations of the [primary violator] in general." Sanders Confectionery Prods. v. Heller Fin., Inc., 973 F.2d 474, 486 (6th Cir. 1992) (emphasis added). "Because 'controlling person' liability is derivative, however, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act." D.E. & J. Limited P'ship v . Conaway, 133 Fed. Appx. 994, 1001 (6th Cir. 2005); accord Azzolini v. Corts Trust II for Provident Financial Trust I, No. 1:03CV1003, 2005 WL 2253971, at *13 (E.D. Tenn. Sept. 16, 2005); In re Prison Realty Sec. Litig., 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000). PSLRA's strong inference requirement does not apply on this claim. See Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001).

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." In re Nat'l Century Fin. Enters., No. 2:03-md-1565, 2006 WL 469468, at *23 (S.D. Ohio Feb. 27, 2006).

In Bomarko, Inc. v. Hemodynamics, Inc., 848 F.Supp. 1335, 1339 (W.D. Mich. 1993), that court explained as to corporate officials:

> [T]itles and functions alone do not establish "controlling person" status. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed. Further, there must be some showing of actual participation in the activities which allegedly violated the securities laws.

Id. at 1032 (quoting Herm v. Stafford, 663 F.2d 669, 684 (6th Cir. 1981). See also In re Telxon Corp. Sec. Litig., 133 F. Supp. 2d 1010 (N.D. Ohio 2000).

As to the individual Defendants' liability as controlling persons, "high-level executives can be presumed to be aware of matters central to their business's operation." PR Diamonds, 364 F.3d at 688. "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.'" Cardinal Health, 426 F. Supp. 2d at 724. This is particularly appropriate for "[f]acts critical to a business's core operations." In re Ancor Commc'ns, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998). A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter. In re Envoy Corp. Sec. Litig., 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001). In In re Direct General Corp. Securities Litigation, 398 F.Supp.2d 888 (M.D. Tenn. 2001), the Honorable Todd J. Campbell, then Chief Judge, held that plaintiffs' § 20(a) claims were sufficiently pled against that corporate defendant's top officers "because of their respective positions

in the company, were each involved in the day-to-day management of [Defendant Company]" and "controlled and/or possessed the authority to control the contents of [Defendant Company]'s reports, press releases and presentations to the public and, through that power, fraudulently misled the investing public." Id. at 898.

Under SEC rules, the Individual Defendants ' responsibilities include:

Disclosure controls and procedures [would] include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, **including its principal executive and principal financial officers**, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

SEC Rule 13a-15(e), 17 C.F.R. 5240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. 5240.1 5d-15(e).

Based upon these authorities and for the reasons stated in the already lengthy analyses of the amended complaint and Section 10(b) issues, the Court concludes that Plaintiffs have stated plausible Section 20(a) claims against the Individual Defendants.

### C. Relief

For the above stated reasons, the Court concludes that under the holistic standard of review, Plaintiffs have alleged sufficient specific facts that collectively state actionable claims under Section 10(b), Rule 10b-5 and Section 20(a). Accordingly, the Defendants' motion to dismiss should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of March, 2013

William J. Haynes, Jr.
Chief Judge .
United States District Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| NORTH PORT FIREFIGHTERS' PENSION-LOCAL OPTION PLAN, Individually and on Behalf of All Others Similarly situated, <br><br>     Plaintiff, <br><br> LAKELAND EMPLOYEES PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, <br><br>     Lead Plaintiff, <br> vs. <br><br> FUSHI COPPERWELD, INC., et al. <br><br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 3:11-cv-00595 <br> JUDGE HAYNES |

**O R D E R**

In accordance with the Memorandum filed herewith, the Defendants' motion to dismiss (Docket Entry No. 68) is **DENIED**.  Counsel for the parties have twenty (20) days to file an case management order.

It is so **ORDERED**.

**ENTERED** this the ⟨handwritten⟩ day of March, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge,
United States District Court